KENNON, Judge.
On January 26, 1946, plaintiff was one of a group of five highway employees engaged in pouring tar in the spaces between the paved sections of the highway between U. S. Highway No. 80 and Doy-line, Louisiana. Alleging that defendant, W. T. Sharpling, was the owner and operator of a Plymouth Sedan upon which the other defendant was the liability insurance carrier, and that Sharpling drove down the road at an excessive speed, ignoring the caution signs and presence of a truck and other equipment on the road, striking plaintiff and knocking him a distance of more than thirty-five feet and imposing serious and permanent injuries, plaintiff filed this suit praying for judgment against both defendants, in solido, for more than $6000.
The Travelers Insurance Company, alleging that it carried compensation insurance covering plaintiff at the time of his injury, intervened in the suit, praying that out of any judgment awarded the plaintiff, Walter C. Wall, it should be paid by preference the amount received from inter-venor by Wall as compensation.
The Great American Indemnity Company, liability insurer of the Plymouth Sedan, filed an exception of no right of action based upon the defense that the policy contained a provision that same should be of no effect in the event the vehicle should be used as a taxi, and that Sharpling had used same for that purpose.
After trial on the exception of no right of action, it was overruled by the District Court.
Defendants in answer admitted that the injury to plaintiff occurred on the date alleged, but set forth that defendant Sharp-ling was operating his car at a speed of not over thirty miles an hour when he approached the group of highway workmen; that as he approached within one hundred feet, one of the workmen who was engaged in warning traffic, signaled him to come on; that after sounding his horn, he proceeded past the highway equipment and working crew at a speed of twenty to twenty-five miles an hour; that the accident occurred when the plaintiff, without looking, stepped directly in the path of the Sharpling car and that the accident resulted solely from the action of the plaintiff in walking directly into the path of the oncoming car without looking and, without heeding the warning horn.
In the alternative, in the event the Court should find Sharpling guilty of negligence, the defendants pleaded the above listed acts of contributory negligence on the part of plaintiff as a bar to his recovery.
In a supplemental answer, the indemnity company set forth that the limit of its liability under the policy involved was $5000.
The District Court rendered judgment for $4996 in favor of plaintiff, giving well expressed written reasons for the judgment. Defendants appealed, and in this Court have reurged their exception of no right of action as well as their defense to the merits.
On the Exception of No Right of Action
The policy covering Sharpling’s Plymouth Sedan was issued for a term of one year beginning October 26, 1945. The purpose for which the automobile was to be used was stated as “business 'and pleasure.” Sharpling’s original 1945 license had been issued in January of that year for normal personal use. On 'November 19, 1945, Sharpling applied for and obtained a second 1945 license in which he stated that' the car was to be used as a taxi, and paid the 1945 taxi license fee of $10 (less $3 credit given him for the personal license previously purchased). On January 3, 1946, Sharpling applied for and was issued .a personal (non-taxi) 1946 license for his car! His testimony is that the taxi business had not been 'profitable and he decided to abandon it un January T, 1946, when his taxi license expired. At *658 the time of the accident the 1946 plates were in the car, but the taxi-type 1945 license was still on his car, as was the taxi sign.
There is no proof that any fares were collected or any taxi trips made by Sharpling after January 1, 1946. On the day of the accident, Sharpling had gone to Shreveport from Doyline with one J. L. Green. Green lived in the same section of the parish as did Sharpling. They were friends and Sharpling had left some of his cattle at Green’s farm, or under Green’s care. Green wished to go to Shreveport to see about some watches and Sharpling wished to secure some chicken wire. Both testified that no fare was paid or contemplated. That the trip was under the control of Sharpling and was not made as a taxi mission for Green is further indicated by the fact that Sharpling, after beginning the return journey and reaching the edge of Bossier City, remembered that he had not purchased the chicleen wire and returned to Shreveport and fulfilled this personal mission before again starting the trip home. Our finding is in accord with that of the District Court which held that, on the day of the accident, Sharpling was not operating the car as a taxi or public conveyance and that Green was not a fare-paying passenger.
On the Merits
At about 11:30 a. m. on the day of the injury, a highway crew consisting of plaintiff and four other workmen was engaged in pouring tar in the crosswise spacing •cracks or crevices in the paved highway leading from U. S. Highway No. 80 to Doyline, Louisiana. The hot tar was procured from a kettle built into a small trailer which was being drawn along the west side of the twenty foot pavement in a ■southerly' direction by the highway truck proceeding” at a slow or “crawl” rate of speed. Besides the driver of the truck and one workman who remained some ten to fifteen feet in rear of the kettle trailer to flag the traffic approaching from the rear; there were three men (including plaintiff) who were engaged in drawing the melted tar into two gallon buckets, equipped with pouring spouts, and pouring same into the crevices of the pavement. These crevices extended across the full width of the pavement at intervals of approximately fifteen feet. One workman held his bucket under the spout extending from the rear of the trailer and when same was filled, dosed the spout and poured the hot tar through the pouring spout along the crack and across the width of the highway. Meanwhile, a second workman was filling his pouring bucket with tar in order to pour the next cross crevice. In the same manner the third workman filled his bucket and poured the next cross crevice, and then the first workman was back at the tar kettle. Meanwhile, the truck driver proceeded on the right side of the pavement at a crawling rate of speed and the flagman followed along in rear with the assigned mission of flagging down traffic approaching from the rear. There was no flagman at the front, the workmen verifying the statement of the rear flagman who testified that “we (the workmen) look for traffic meeting us, and I am watching for traffic coming from behind.”
Sharpling testified that as he drove south, he observed the highway equipment and crew and slowed his car down to six to eight miles an hour; that when he was “something like sixty feet” behind, the flagman gave him the signal to come ahead; that he then accelerated his speed and was in second gear going approximately twenty-five miles an hour when he passed the flagman, who was ten feet behind the kettle trailer; that he was watching Pace, a workman who had just finished pouring his line and who was on the left shoulder, when the plaintiff, Wall, in a stooped position pouring the tar, came out into the left lane; that he swerved to the left, applied his brakes and Pace yelled to Wall, who jumped into the air and fell on the hood of Sharpling’s ■ car, which carried him some twenty-seven or twenty-eight feet down the road before he fell off. Sharpling denied seeing the flagman give a slow down sign and testified that he blew his horn twice before speeding up at the time he received the “come on” signal Green, his passenger, testified that he saw *659 the slow down signal given by the flagman. He fixed the speed of the automobile at the time of the impact at approximately twenty-five miles per hour. Both said they saw the workman Pace, who was working just ahead of plaintiff, pour his line from the right to left of the road, and saw plaintiff Wall as he was drawing his bucket full of tar. Both testified that they did not see him look in their direction. Sharpling testified that he knew that plaintiff would pour his line across the highway, but was not aware that he was going to do it while he, Sharpling, was passing. Plaintiff testified that he began to pour his line from the right (west) side of the pavement at a fast walk and was well over into the left side when, in response to the warning shout by Pace, he jumped in his futile effort to get out of the path of the car. When he fell from the hood of the Sharpling machine, his body was partly on the left shoulder of the highway and partly on the pavement.
Maddry, the flagman, testified that Sharpling was coming at a fast rate of speed; that he signaled him to slow down and when he kept coming at the same rate of speed, he finally motioned for him to turn to the left, hoping that the driver would succeed in going around plaintiff Wall, who was pouring tar from right to left. Maddry measured the distance between the point where Sharpling struck Wall and the place the sedan stopped at thirty-three steps, or approximately one hundred feet. The truck driver did not see the approaching automobile or know that anything was wrong until he heard a noise “like two cars coming together,” and then saw Wall on the ground. Pace and Roberson, who were pouring tar with plaintiff, verified Maddry’s testimony that the Sharpling car approached at a fast speed and did not slow down.
We find that Sharpling was guilty of negligence in proceeding at an excessive rate of speed past the equipment and workmen at a time when he was aware that plaintiff and his fellow workmen were engaged in repairing the highway. We further find that, while the- truck and kettle blocked only half of the highway, Sharp-ling had seen the men pouring tar across the whole pavement width and knew the workmen’s duties required them to pour lines across both sides of the highway. We further find that he did not slow down as he approached this obviously dangerous situation. We also find, as Sharpling testified as he drew close, after seeing plaintiff at the tar kettle with his back to the approaching danger, he did not look again in the direction, of plaintiff or the tar kettle; that while plaintiff was in plain view as he went from the kettle to the west edge of the pavement and while pouring from west to east across the pavement, Sharpling first observed that plaintiff was entering the left side of the highway when the workman was only six feet in front of the sedan. Sharpling blew his horn at that time, but it was too late for Wall to take action that would avoid the collision.
Having found that Sharpling was guilty of negligence, we next consider the defense that plaintiff Wall was guilty of contributory negligence in not observing the approach of the Sharpling car before he came out into the left (east) side of the pavement.
 The record shows that all highway workmen are told by their foreman to be careful and to watch for traffic coming from both directions, and we find in- this case that Wall did not look to the rear just prior to the injury when he began to pour the tar across the pavement. Had Wall not been an employee of the highway department but simply a pedestrian crossing the highway for his own purposes, there is no doubt but that his failure to look for traffic in both directions would constitute negligence and would be a legal bar to his recovery (unless the circumstances were such that the doctrine of the Rottman v. Beverly et al., 183 La. 947, 165 So. 153, last clear chance, is applicable). However, a man whose entire working day is spent on the paved portion of a road and whose 1 principal attention must necessarily be .directed toward the performance of the drawing, carrying and pouring, without spattering, of liquid tar kept at a temperature of 400 degrees, cannot be always alert to the approach of traffic. In *660 recognition of this situation, the highway foreman had- placed Maddry on duty as flagman to insure that approaching automobiles were slowed down and alerted to the danger incident to the presence of the workmen on the highway immediately in front. The testimony shows that the workmen kept a look ahead where it was convenient from their position behind the tar kettle, and where no flagman or guard was on duty, and that they — at least to a substantial extent — depended upon the pro- ' tection of the flagman or guard stationed between them and the traffic coming from their rear. This road, while wide paved, is little used since the manufacture of munitions has ceased at the Doyling ordnance plant. Under all the circumstances, we doubt that the defendants, who were under the burden of establishing the facts constituting the contributory negligence pleaded, have discharged this duty by the preponderance of the evidence.
 Defendants have contended that, in proceeding past the highway repair point, Sharpling relied upon the signal of the flagman who 'motioned him to the left and ahead. It may be that the flagman, when he observed- defendant’s failure to slow down and that he was coming at an excessive speed, should have stuck to his slow down or stop signals instead of meeting the emergency ‘by waving the insistent driver to the left and risking whether or not he would clear plaintiff as he -came across the pavement. However, the negligence vel non of this flagman is not at issue because plaintiff is not chargeable with the contributory negligence of others, even of his fellow workmen, and the fact that defendant had virtually forced the flagman into a signal for him to proceed forward did not justify his proceeding past the working men at a dangerous rate of speed without watching out for the emergency that is so likely under the situation. As has been often stated, the first duty of those who operate motor vehicles is to keep a sharp lookout to discover the presence of those who may be endangered by virtue of being-in the vehicle’s path. Plaintiff’s duty required him to be on the highway at that point and it was defendant’s duty to operate his car at such speed and to keep his car under control and to keep himself on the alert, all in such manner as to meet the hazards which -should be reasonably anticipated under the situtation confronting the approaching motorist at the time and place.
Granting, arguendo, that plaintiff’s failure to look to the rear constituted contributory negligence, we note that the District Judge correctly found that the doctrine of last clear chance is applicable. Justice ' Odom of the Louisiana Supreme Court first set forth this doctrine in 1935 in the Rottman case, supra. The principle was followed — and somewhat extended-— in the case of Jackson v. Cook, 189 La. 860, 181 So. 195, and has since been followed by the Louisiana Courts in many other cases.
In the Rottman case, the plaintiff recovered damages despite the fact that she proceeded diagonally across a main highway without looking for approaching traffic, and this gross negligence continued up to the moment of collision with the approaching vehicle, whose driver • saw her perilous position in ample time to have averted the accident had he used proper precaution.
In the Jackson case, supra, the plaintiff was guilty of gross contributory negligence by walking, or rather staggering in a drunken condition along the wrong side of the highway. Defendant’s son, who was driving an approaching automobile, did not see the plaintiff until the car was, as in the present case, about five feet from him and too late to avoid the accident. The Supreme Court, in holding the defendant liable, stated [189 La. 860, 181 So.2d 198] : “In the present case (Jackson v. Cook), the plaintiff was guilty of gross negligence which continued up to the moment of the accident. The driver of the car did not see, but could have seen, plaintiff in his peril if he had been looking ahead. The mere fact that the driver of the car in this case did not see plaintiff does not absolve the defendant from liability, because it was the duty of the driver to look, and, according to the findings of both courts, he was not looking.”
*661 In the present case, the accident happened on a straight road, at midday, and in clear weather. Defendant Sharpling ■observed the highway repair equipment and the workmen on foot at considerable distance ahead. He saw those pouring the tar leaving the tar kettle and performing the constantly repeated task of pouring the tar across the full width of the highway. He saw plaintiff’s fellow workman Pace pour bis line. He saw, while sixty feet away, the plaintiff filling his bucket at the tar kettle. He knew, according to his own testimony, that plaintiff, when he filled his bucket, would necessarily traverse the entire width of the road. He observed that the plaintiff had not looked around in his ■direction. In spite of these circumstances, he proceeded the last sixty feet at a relatively high rate of speed without further ■observation of plaintiff’s movements. The testimony of the workmen indicates that Sharpling did not slow down. The flag- ' man testified that he gave him the signal to come ahead only when he realized he was not going to slow down and felt that there was- danger of Sharpling striking him, the flagman’s hope being that Sharp.ling would be able to pull far enough to the left to avoid hitting plaintiff.
The testimony of Sharpling is that he, at a sixty foot distance in the rear of plaintiff’s position at the tar kettle, slowed down to six or ■ eight miles an hour, and after receiving the signal, speeded up to the twenty-five .miles an - hour speed at which his automobile struck plaintiff. The plaintiff had filled his bucket and turned off the spout at the tar kettle. He proceeded westerly several feet to the west edge of the pavement. Beginning at the intersection of the crevice with the west edge of the pavement, he moved smartly eastward across the highway, paying attention to keeping the spout exactly over the line he was pouring. The pavement was twenty feet wide. He was struck at a time when he had traversed the west half and approximately half of the east half. The distance he had traveled from the west edge to the center and thence a few feet into the east half would be thirteen to sixteen feet. During this same time, defendant at the rate of twenty-five miles per hour covered .approximately six times this distance, or seventy-five to ninety-five feet. The actual stopping distance, after discovery of peril, of a car with good brakes (and defendant testified his were in good condition) at a speed of twenty-five miles an hour is much less than seventy-five feet. See table, page 706, § 6237, Volume 9, Part 2, Blashfield Cyclopedia of Automobile Law and Practice. Perm.Ed.
It is therefore obvious that defendant Sharpling, had he observed plaintiff and taken proper precautions, would have had ample time to avoid the accident. Instead of watching plaintiff and observing his peril and taking precaution to avoid injuring him, defendant’s testimony is that while he had slowed down to six or eight miles an hour when sixty feet in rear of plaintiff, and observed him as he was drawing tar from the kettle; and that, during the succeeding brief interval — when had he been looking, he would have observed plaintiff moving' from the west edge across the pavement and heading into the path of his automobile — he, instead of continuing at a slow rate, or stopping, proceeded to accelerate his automobile from a speed of six or eight miles per hour to that of twenty-five or thirty miles an hour. This active negligence occurred at a time when he could have seen the plaintiff in his perilous position had he looked. Defendant is chargeable with not having seen what he should have seen. Under these circumstances, defendants are liable under the doctrine of the Rottman and Jackson -cases, supra.
Quantum
Plaintiff was seriously injured, suffering multiple fractures of the pelvis and a fracture of the left arm. He was badly bruised and suffered considerable shock. He remained in a sanitarium for six or seven weeks. At the time of the trial, more than three years after his injury, he was still disabled and suffered from considerable atrophy of muscles in the. vicinity of his hip injury. The doctors testified that he could not do hard physical labor, and while the doctor -called by defendants testified that much of his condi *662 tion was due to nervousness or- mental causes, the fact remains that he, at the time of the trial, had been disabled for more than three years and was still unable to do manual labor. The record therefore amply sustains the award made by the District Judge.
A joint stipulation by counsel for plaintiff and intervenor, filed in this Court, indicates that additional compensation of $365.75 was paid by intervenor to plaintiff between the date of trial and the date of filing stipulation. For this reason, the judgment of the District Court is amended by increasing the award to intervenor to $1716.29, and as thus amended, the judgment is affirmed, with costs.