**LINEAS AEREAS COLOMBIANAS EXPRESAS, Appellant,**

**v.**

**The TRAVELERS FIRE INSURANCE COMPANY, Appellee.**

**No. 16857.**

United States Court of Appeals
Fifth Circuit.

June 30, 1958.

Rehearing Denied July 30, 1958.

Claude Pepper, Walter A. Apfelbaum, Miami, Fla., Clarence Brown, Miami, Fla., Pallot, Cassel & Marks, Miami, Fla., for appellant.

David W. Dyer, Miami, Fla., David L. Corbin, New York City, Smathers, Thompson & Dyer, Miami, Fla., Haight, Gardner, Poor & Havens, New York City, of counsel, for appellee.

Before CAMERON, JONES and BROWN, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

The question here is whether the District Court, after discharging the deadlocked jury, erred in entering *j.n.o.v.* on the Insurer's motion, Fed.Rules Civ.Proc. rule 50(b), 28 U.S.C.A., and thus determining as a matter of law that the total loss of a C-46 airplane at Leon, Mexico, June 18, 1955, was not covered under the Insurer's All Risk Hull Policy. Lace,[1] the owner and Assured, seeks reversal and rendition on its counter motion for instructed verdict, and at all events a new trial.

██ The plane crashed during an attempted take-off at Leon, Mexico, while being flown by two Mexican pilots. For our purposes, as conflicts would be a jury matter, we must assume, as does the Insurer in its argument, that this particular flight was contrary to Lace's instruc-

---

1. This is the accepted abbreviation for Lineas Aereas Colombianas Expresas, a Colombian corporation. Its principal management apparently was in Miami, Florida where the policy was presumably solicited and was certainly delivered.

tions since its representative, Captain Kiss, was not then aboard as required and had indeed categorically told the Mexican pilots that they must not again fly the ship in his absence. Despite this assumption, the Insurer insists that there was no liability for three principal reasons under the policy. The first was that the policy provided [2] affirmatively that it should apply only while the plane was being flown by pilots in the regular employ of the Assured approved by the Aviation Managers and who held requisite United States CAB certificates or comparable licenses issued by Colombian air authorities, and neither the Mexican pilot nor co-pilot qualified on either score. Second, that liability was excluded [3] for operations with the knowledge and consent of Assured which were unlawful and violated federal civil Air Regulations and this had occurred here as carriage of passengers for hire and flight on this route was contrary to the certificate originally issued by the Colombian authorities. And third, that if, as Lace claimed, it was a conversion or an unauthorized taking, then it was excluded [4] under the usual provision relating to unlawful conversions by "mortgagee, vendee, lessee, or other person in lawful possession" of the plane, since it was in the possession of the Employer of the Mexican pilots.

To this Lace makes a comprehensive answer: if the flight was contrary to its instructions, the use of uncertified, unapproved pilots and the making of an unauthorized passenger flight on an unauthorized route was not with its knowledge and consent, and such action was at least conversion by persons other than those described in VIII(d), note 4, supra.

Lace was the owner of this plane which was registered under Colombian law [5] as HK-808. It was, of course, a plane owned and registered under the laws of Colombia and operated in accordance with its laws and regulations that was the subject of this insurance. There is not the slightest suggestion that the Insurer meant to take on the risks to a

---

2. "When the aircraft is in flight, this policy covers it only while being operated by the following pilot(s): Pilots holding valid Airman Certificates with Airline Transport Rating and such other ratings as are or may be required by Civil Air Regulations, or holding equivalent Airman's Certificates issued by the duly constituted authority having jurisdiction over Civil Aeronautics in the Republic of Colombia, S. A. * * * Each such pilot must be in the regular employ of the Insured and approved by the Aviation Managers. Co-pilots holding valid Airman Certificates and proper ratings, as required by Civil Air Regulations of the United States or the Republic of Colombia, S. A., may operate the aircraft as co-pilots only, provided each such co-pilot has previously had at least 1000 hours flying experience, is in the regular employ of the Insured and approved by the Aviation Managers."

"Civil Aeronautics Authority" was expressly defined by endorsement "as the duly constituted authority having jurisdiction over Civil Aviation in Colombia, S. A."

3. "Part VIII. This policy does not cover, * * *

"(g) Loss or damage from any risk while the aircraft is in flight during or as a result of its operation with the knowledge and consent of the Insured:

* * * * *

"(2) For any purpose or in any manner or condition requiring a special permit or waiver from the Civil Aeronautics Authority (even though granted) unless with the express written consent of the Aviation Managers.

* * * * *

"(4) Unlawfully or for any unlawful purpose or during flights or attempts thereat in violation of any federal regulation for civil aviation."

4. This exclusion was contained in part VIII, note 3, supra, and thus read:
"This policy does not cover, * * * (d) Loss or damage due to wrongful conversion, embezzlement or secretion by mortgagor, vendee, lessee or other person in lawful possession of the insured property under a mortgage, conditional sale, lease or other contract or agreement whether written or verbal."

5. The Insurer, by request for admissions and certified copies of them established as uncontradicted facts the Colombian and Mexican laws, the regulations issued by pertinent air regulatory agencies and the status of the Mexican pilots.

plane of any other nationality or leave it to the Assured to determine whether operational risks or hazards from flight under any other flag or control were altered whether favorably or unfavorably.

With this as a point of departure the facts will, we believe, establish conclusively that Lace by its own acts put the plane in operation wholly beyond the scope of the policy so that it was effectively suspended.

In May 1955 Lace was approached by LTV [6] to whom it had previously sold a C-46 which was then temporarily out of service for repairs, seeking a lease of this plane. An oral agreement, perhaps outlined in a unilateral letter to Captain Kiss, the original of which was supposedly burned in the plane's destruction and copies of which were never located, was entered into. Under it, the plane was to be made available to LTV for thirty days' use in the carriage of laborers on intra-Mexican flights. It was nothing less than a joint operating venture as LTV, the party having the basic transportation contracts covering the laborers, was to supply the business, collect all revenues, pay all expenses, and then divide the profits on a 50/50 basis with Lace for the use of its plane. And in this analysis, we can assume that an essential ingredient of the arrangement was that Captain Kiss was to be in charge of the plane and aboard at all times while it was in flight.

But even with this provision, the arrangement had several decisive implications and consequences. Lace knew, for example, that under Mexican law the plane would have to be registered as a Mexican plane. It knew also that to be so registered, it would have to be deemed the property of a Mexican national or entity, and that to be eligible for temporary entry and operation, the plane would have to be piloted by Mexican pilots. All such steps were taken, as Lace knew

would be the case, by its co-venturer-partner LTV. The Mexican owner was shown to be Henriquez, the moving figure in LTV, the new number [7] XA-LID was assigned and painted on the plane in lieu of HK-808 and, as Lace expressly knew, LTV represented that the plane would be flown by a Mexican pilot whose name was stated in the various papers as Captain P. A. Alfredo Rivero G. who was, it turned out, the pilot at the time of the crash, June 18.

All of these things inexorably resulted in a violation of basic assumptions of the coverage afforded by this policy. It first altered the nationality of the plane and that action committed it to an operation contrary to Colombian law. For under Colombian law coexistence of two or more registries was forbidden and, worse, transfer of an aircraft to a foreign registry was prohibited unless expressly approved. Next, under its "Certificate of Air Navigability" issued by the Department of Civil Aeronautics of Colombia, the use of HK-808 was expressly limited to "cargo service" and no authorization or permit was granted by the Colombian authorities to use it for the transportation of passengers or to operate it over the route on which it was being flown at the time of the accident or over which it was known it would fly at the time Lace made the arrangement. Finally, the law of Colombia prescribed that all flight personnel on an aircraft of Colombian registry were required to have licenses "issued by the general direction of Civil Aeronautics." Lace knew, of course, that Mexican pilots and copilots would be required during the plane's stay in Mexico, and neither of them held the requisite Colombian license.

In our view, this made the subsequent activities quite immaterial. This included the testimony which the jury could credit that before the plane was flown from Miami to Mexico, Lace specifically prescribed that Captain Kiss should at all times be in charge of and aboard the

---

6. Linea Tigres Voladores sometimes also referred to as "Flying Tigers of Mexico."

7. Under International Air Conventions, a letter prefix is assigned for each country. Colombia is "HK" and Mexico "XA."

plane while in flight, and that, after the plane began its intra-Mexican operations, Captain Kiss emphatically renewed this demand at least two times. The last occasion for this, according to him, was just prior to the time he left Mexico about June 15 to go to California to get his immigrant status clarified, and again while in California when, to his amazement, on the night before the crash he learned in a long distance request from Captain Rivero for spare parts, that the plane had made a trip during his absence. Captain Kiss then again demanded of the pilots that the plane not be flown and he emphasized this to Henriquez as well. In doing this, we go the next step and assume that despite this last demand by Captain Kiss, LTV undertook to fly the plane on the flight which turned out to have been its last one resulting in its total destruction and the death of some 18 passengers.

■■ These matters are of no consequence because, in our judgment, this plane for this period of time was no longer covered. What the factors are which insurers consider to be of underwriting importance is not for us to assay. Canal Insurance Co. v. Dougherty, 5 Cir., 247 F.2d 508; Maryland Casualty Co. v. Southern Farm Bureau Casualty Insurance Co., 5 Cir., 235 F.2d 679; C. E. Carnes & Co. v. Employers' Liability Assurance Corp., 5 Cir., 101 F.2d 739. But we have here no hesitancy in saying as a matter of law that all of these actions related to matters which this policy reflected were considered to have, and did have, genuine relevance. The Underwriter insured, so it thought, a Colombian plane, but the owner with its own "knowledge and consent" had voluntarily changed that. It was now a Mexican plane. In the course of doing so, it had violated the underlying assumption of the policy and the laws of its own country and that of the plane's registry. The Insurer underwrote, or so it thought it had, a plane that would be operated by persons qualified under the Colombian law and in accordance with its Colombian Certificate of Air Navigability. The owner, again by voluntary and conscious action, put it into a service in which it knew the plane would be operated, in part at least, by pilots or copilots not holding Colombian licenses and would be engaged in a service having hazards and risks quite different from those of a Colombian air freight carrier.

The result of this was to change altogether the whole character of the risks which were underwritten. With these major changes between the nature of the exposure undertaken and that which the Assured's voluntary conduct precipitated, it will not do for the Assured to say that with respect to this loss these admitted violations or actions were of no consequence. To do so would first amount to allowing Judge or Jury, unaffected by the painful prospect of paying a claim, to determine what factors are or are not of relative importance in evaluating a risk either for the scope of the protection afforded, the nature of protective limitations required, or the cost in terms of premiums. And, in a very real sense, we cannot say that these actions were unrelated to the loss. If, for example, we assume that Lace's theory is correct that these Mexican pilots, indifferent to traditional concepts of responsible property rights, flew the plane away contrary to instructions, the question immediately arises: how did this come about? The answer, so plain, is that it was the direct result of the relationship created by the Assured and LTV. The payment of a 50/50 profit split was the sole reason for this plane being flown into Mexico with the purpose of its being based in Mexico, exposed to Mexican hazards, both of nature and man, for a full thirty days' period.

■ This is not to analyze it in terms of traditional notions of proximate cause for this is not the test. Union Commercial Travelers v. Greer, 10 Cir., 43 F.2d 499; Flannagan v. Provident Life & Accident Co., 4 Cir., 22 F.2d 136. It is but another manifestation that underwriting is the business of estimating risks. May

not an insurer have properly taken into account[8] that one nation had better or more stringent laws or regulations, that pilots of one nation would be more dependable than another, that the plane would be exposed to less hazards if operated in strict accord with one nation's certificate and regulations rather than another, that, on the ground or in the air, the plane would be safer if based or operated out of one country rather than the other?

It is just such consideration that have led to the development of the principle, expressly acknowledged by Lace in the briefs here, of suspension[9] of coverage. It is, of course, true that development of the law along these lines has come from the desire to avoid an outright forfeiture. Consequently coverage is not permanently destroyed. It is suspended so long as, but only so long as the violations of the specified basic policy requirements continue. Equally clear, coverage is revived the moment the breaches or conditions cease. But until that time, there is no insurance for "While the proscribed activity continues, the insurance is suspended as if it had never been in force." Travelers Protective Association of America v. Prinsen, 291 U.S. 576, 582, 54 S.Ct. 502, 504, 78 L.Ed. 999, 1003.

But here the proscribed activity continued up to the moment of loss. The plane remained in Mexico when Kiss had to leave the country. Nothing which he either did or intended to do put an end to the arrangement between Lace and LTV. Had he meant to, there was no evidence that he had any such authority. His insistent demand first to Captain Rivero, and later to Mr. Henriquez himself, that the plane must not be flown was a reaffirmation, not a termination, of the arrangement. The plane had to come into Mexico to remain for 30 days during which time it would be used to carry on the mutually profitable activity of carrying Mexican on Mexican flight. Nothing up to the moment of loss changed that. All of the hazards to which the arrangement exposed the plane continued. They were not the same hazards which the Insurer had underwritten for they arose in a different country on a different route in a different service during the time that the plane was committed to the care and operation of people of a different nationality having different qualifications.

8. These considerations are not eliminated by the fact that a policy endorsement stated that "The aircraft may be operated in Mexico, Central America, South America, north 5° north latitude, the islands of the West Indies and on over water flights within these areas, the route of which does not involve flying more than 300 nautical miles from land." Or that, in the insuring clause, it expressly covered the aircraft while "used for the following purposes private pleasure and private business flying, passenger and freight flights for hire or reward, * * * subject to all the provisions, conditions, and limitations of the policy." These provisions and conditions, implied in one and expressed as to the other, encompassed those set forth in notes 2 and 3, supra.

9. Among the many cases showing the affirmative and negative limitations of the doctrine of suspension are: Fidelity Phenix-Fire Insurance Co. v. Pilot Freight Carriers, 4 Cir., 193 F.2d 812; Hutto v. Atlantic Life Insurance Co., 4 Cir., 58 F.2d 69, 71; Ciaramitaro v. Saskatchewan Government Insurance Office, D.C.Mass., 144 F.Supp. 237, 1956 A.M.C. 928, affirmed 1 Cir., 234 F.2d 491, 1956 A.M.C. 1400; Waters v. National Life & Accident Insurance Co., D.C.Okla., 61 F.Supp. 957; Fort Worth Lloyds Insurance Co. v. Lane, Tex.Civ. App., 189 S.W.2d 78 (no writ history); American Lumbermens Mutual Casualty Co. v. Wilcox, D.C.N.Y., 16 F.Supp. 799; Nichols v. Hawkeye Casualty Co., 233 Iowa 838, 10 N.W.2d 533; Resolute Insurance Co. v. Mize, 221 Ark. 705, 255 S.W.2d 682; Wall v. Great American Indemnity Co., La.App., 46 So.2d 655; Maryland Casualty Co. v. Aguayo, D.C. Cal., 29 F.Supp. 561; Imperial Assurance Co. v. Perry, 252 Ala. 424, 41 So.2d 394. See, also, 5 Appleman, Insurance Law and Practice, § 2944, p. 18, § 3002, p. 71; 7 Id. § 4326, p. 107 and 114; 29 Am.Jur., Insurance, §§ 751–757; and Annotations, 52 A.L.R. 843; 10 L.R.A.,N.S., 726; 28 L.R.A.,N.S., 593; 32 L.R.A., N.S., 240; 48 L.R.A.,N.S., 1221.

■ Until such time as there was an authoritative determination to put an end to these actions in violation of important parts of the policy and effectively withdraw the plane from this arrangement for registration and operation under the Mexican flag, its laws and regulations and under the operation, complete or partial, of Mexican pilots, the suspension continued. The situation is much like that considered in Henjes v. Aetna Insurance Co., 2 Cir., 132 F.2d 715, 1943 A.M.C. 27, in which the Court held that coverage once suspended could be revived when the violation was purged or as soon thereafter as the subject of insurance (there a tug) was once again completely removed from the risks and hazards to which the violations had exposed it. Where this line would have been here we need not fix for Lace had never even thought about withdrawal, much less taken any action.

■ As the policy coverage was suspended, we need not determine whether the particular flight by the two Mexico pilots was or was not with Lace's knowledge and consent. Clearly the fact that the plane was engaged in operations which violated its Colombian Certificate, the Colombian law, and hence the requirements of the policy was uncontradicted. The exclusions in Part VIII(g), note 3, supra, are for loss or damage sustained in flight during the time that the airplane is engaged in or committed to an operation carried on with the knowledge and consent of the Insured and which is contrary to law, regulation, certificate, and hence the policy terms. For, "The clear meaning of the policy is not as the appellant suggests that the risk is excluded if the injury is caused by a violation of the regulations, but that the risk is excluded if the injury is caused by the operation of the plane *while* it is being used in violation of the regulation," Bruce v. Lumbermens Mutual Casualty Co., 4 Cir., 222 F.2d 642, 645. Kilburn v. Union Marine & General Insurance Co., 326 Mich. 115, 40 N.W.2d 90; James v. Federal Insurance Co., 5 N.J. 21, 73 A.2d 720.

We could say much the same on whether their unauthorized flight amounted to a conversion by one not in lawful possession under a "mortgage, conditional sale, lease or other contract or agreement," although we are clear that this arrangement was within the phrase "other contract or agreement whether written or verbal." The contract between Lace and LTV was for the *use* of the specific plane, not a contract for Lace to supply a service. Indeed, Lace had no standing to perform transportation in Mexico. The most that it could legally do, and even this seems doubtful, was to supply the HK–808 to LTV for its ostensible ownership, deceptive registration in Mexico, and operation. Where the plane was to fly, what passengers it was to carry, how much they were to be charged, what schedules were to be maintained. how much was to be spent, what expenses were to be incurred in the use, operation, repair and maintenance of the plane in carrying out the service, were the sole responsibility of LTV. This was sufficient.[10]

---

10. Under the arrangement LTV was something much more than the mere naked bailee thought not to come within "other contract * * *, written or verbal" in Williams v. General Motors Acceptance Corp., 61 Ga.App. 750, 7 S.E.2d 402; Allen v. Berkshire Mutual Fire Insurance Co., 105 Vt. 471, 168 A. 698; cf. Home Insurance Co. v. Paul, 128 Okl. 142, 261 P. 927; and Fidelity Phœnix Fire Ins. Co. v. Oldsmobile Sales Co., Tex.Civ. App., 261 S.W. 492 (no writ history). Casting about for an easy analogy, the status of LTV whose employees had to be aboard to fly or assist in flying the plane was something more than that of a time charterer of a vessel who has substantial rights and liabilities and sufficient direction and control as to subject the charterer to many obligations of an owner, Pendleton v. Benner Line, 246 U.S. 353, 38 S.Ct. 330, 62 L.Ed. 770; Dampskibsselskabet Dannebrog v. Signal Oil & Gas Co., 310 U.S. 268, 60 S.Ct. 937, 84 L.Ed. 1197, 1940 A.M.C. 123; cf. Park S.S. Co. v. Cities Service Oil Co., 2 Cir., 188 F.2d 804, 1951 A.M.C. 851, even though, with the owner's crew in sole navigational command, it does not have such "possession" as to entitle it to re-

The uncontradicted facts showed that Lace was not entitled to recovery for this loss. It was therefore proper for the Court to grant Insurer's motion for *j.n.o.v.*

Affirmed.

cover for damages to the vessel, Robins Dry Dock & Repair Co. v. Flint, 275 U.S. 303, 48 S.Ct. 134, 72 L.Ed. 290, 1928 A.M.C. 61; it was perhaps something less than a demise (bare boat charter) since the Mexican pilots who were required to be aboard had to work with

and presumably under Kiss's command, see United States v. Shea, 152 U.S. 178, 14 S.Ct. 519, 38 L.Ed. 403; and generally see Gilmore and Black, The Law of Admiralty, 1957, c. IV, Charter Parties, pp. 170–219.