[Civ. No. 502. Fourth Appellate District.—November 23, 1931.]

NORRIS H. HILTON, Respondent, v. FEDERAL INSUR-
ANCE COMPANY (a Corporation), Appellant.

496

O'Melveny, Tuller & Myers and H. R. Snyder for Appellant.

Forgy, Reinhaus & Forgy for Respondent.

BARNARD, P. J.—On or about June 1, 1927, the defendant insurance company issued to one Farwell, as owner of the sloop "California", a policy of insurance covering that ship. On or before November 13, 1927, Farwell sold the ship to this plaintiff, a bill of sale being executed to the plaintiff's wife and the testimony showing that the purchase price was paid out of their community funds. At the same time, the policy of insurance was assigned by Farwell to the plaintiff. The policy in question contained the following clause: "It is also agreed that this insurance shall be void in case this policy or the interest insured thereby shall be sold, assigned, transferred or pledged without the previous consent in writing of the insurer."

It is conceded that the written consent of the defendant to the transfer in question was never obtained. On March 4, 1928, while in the possession of the plaintiff, the sloop was run aground in the middle of the entrance to Newport Bay. The day after the ship went on the rocks, the defendant's agent in Los Angeles instructed a firm of marine engineers to "proceed to the scene of the loss and to do the necessary". At that time the engineers informed the defendant's agent that they had already heard from a firm of

salvors and that they were already on the job. The agent asked if these parties were satisfactory to the engineers and upon being told that they were, instructed them to have the salvors continue with the work. It is conceded that at that time neither the defendant nor its agents had knowledge of the fact that the ship had been sold or the policy assigned. On the following day, the plaintiff called upon the defendant's agent in Los Angeles and after telling him of the loss, told him that he had purchased the boat. At that time the plaintiff left with the agent the policy of insurance with the assignment thereof, and the bill of sale which he had received from Farwell. The record shows the following conversation: ''Q. Did any other conversation take place that day? A. Except he asked me for all the papers I had and I gave them to him, and that he would take it up with the Insurance Company and try to settle it as soon as possible, the way I understood it. Q. To settle it as soon as possible? A. Yes, and I abandoned the boat to them at that time, that is they took charge of it. Q. They took charge of the boat? A. Yes.''

The plaintiff testified that in the same conversation, when he asked the defendant's agent for the payment of the insurance money, the agent replied that ''he would see, he would take it up''. He also testified as follows: ''Q. Did you see Mr. Hutchison (the agent) after that to demand your insurance again? A. Yes, several times. Q. About how long was the next time? A. I was there several times. Once he was sure he was going to have it all right, and I remember one time he thought if I would come back in about a week he would have it all fixed up. Mr. Snyder: We object to the answer unless the time is more definitely fixed. By Mr. Reinhaus: Q. Well, about how long was this after the first conversation when he said he thought he would have it for you in about a week? A. It must have been a good month. Q. A good month after that? A. Yes. Q. Did he ever refuse to pay the insurance? A. The last time I was in there. Q. About when was that, if you remember? A. I would say that was six weeks. Q. About six weeks after the wreck? A. I imagine so. Q. What did he say at that time? A. He said they had just turned me down.''

One of the firm of marine engineers who had been instructed by defendant's agent to take charge of the boat the

day after it went aground, testified that a few days later the defendant's agent told him that he was not interested in the vessel but that when he asked him whether they should "lay off", he replied: "Not until I instruct you." He further testified that he was not instructed to lay off until March 28th, at which time he advised the salvors that they had been called off. However, the salvors continued the work, the reason therefor being testified to as follows: "Q. And why did you continue to work after the 28th when he called you off? A. About March 28th or 29th we had the 'California' on a derrick barge as she had gotten so badly damaged she wouldn't float, and under Mr. Young's instruction we hired a derrick barge from another boat concern to lift the 'California' and we were towing her to our ways on the 28th or 29th and another boat came alongside making a wave and turned the barge over letting the California go down in the channel again, but we were well up in the channel near our ways and immediately that it happened I called Mr. Young and notified him and at that time he says, 'Gee Rodgers, I got a telephone and they have called us off the job and we have nothing more to do', and I says, 'What are we going to do with it?' and he says, 'If I were you I would get her on the ways anyway and get her out of the channel.'"

The evidence then shows that the boat was gotten to the shipyard; that it was a complete wreck; that under instructions from the marine engineer the salvors burned the frame; and that under instructions from the defendant's agent they sold such salvage as they could, it being testified that this agent told them to "sell the lead keel and what other salvage you have and credit it on the bill". It also appears that among the salvage was the ship's engine and that the plaintiff removed the engine and sold it for his own benefit. About six weeks after the vessel went on the rocks, the defendant's agent notified the plaintiff that the company would not pay the amount of the insurance. This action followed, resulting in a judgment for $2,000, being the amount named in the policy, and from that judgment the defendant has appealed.

The first question presented is whether the provision in the policy that the same should not be assigned without the written consent of the insurance company, was waived by the appellant. This is a question of fact. (*Wheaton* v.

*North British & M. Ins. Co.,* 76 Cal. 415 [9 Am. St. Rep. 216, 18 Pac. 758] ; *Benninger* v. *Phoenix,* 57 Cal. 644.) The trial court found that this provision of the policy had been waived. Our first consideration then is as to whether this finding is supported by the evidence. The appellant relies in part upon a clause in the policy, reading as follows: ''and it is especially declared and agreed that no acts of the insurer or insured in recovering, saving or preserving the property insured shall be considered as a waiver or acceptance of abandonment''.

It will be noted that while it is thus provided that no acts of the insurer in saving or preserving the property shall be considered as an acceptance of an abandonment, a subject which will hereafter be considered, it is not thereby provided that no acts of the insurer shall be considered as a waiver of the provision of the policy which is here under consideration. Even assuming that in such an emergency as the grounding of a ship an insurer would have the right to take emergency steps to save the property for the benefit of all concerned without waiving any provision of the policy, and bearing in mind that the first act of this insurer on the day after the boat went on the rocks was taken before it had knowledge that the policy had been assigned, the facts here present a somewhat different situation. While there was evidence to the contrary, which we are asked to accept as conclusive, we think there is sufficient evidence to sustain the court's finding. It is undisputed that the appellant had notice of the violation of this provision on the second day after the ship went aground. There was evidence that at that time the plaintiff demanded payment under the policy and that the defendant's agent told him he ''would see, he would take it up''; that he stated he would take it up with the company and try to settle it as soon as possible; that he asked for and received the insurance policy and the bill of sale of the boat; that on one occasion he told the respondent that he was sure he was going to have it all right and on another occasion, which was fixed as about a month after the injury to the boat, he told the respondent to come back in about a week when he thought he would have it fixed up; and that about six weeks after the accident he informed the respondent that the company refused payment. The evidence is uncontradicted that for about three weeks after

the injury to the boat the appellant's agents were in charge of it and trying to get it to shore, and that during this period the boat was moved part way to shore, where it was sunk. The evidence is also undisputed that during the succeeding three-weeks' period the salvors, under the suggestion of the agent of the appellant, continued to work upon the boat, finally getting it to shore where the framework was burned and certain salvage taken out, and there is evidence that some time during these last three weeks the appellant's agent in Los Angeles instructed the salvors to sell the salvage and apply it upon their bill.

It is urged by appellant that the respondent did not change his position to his damage, since he testified that there was nothing he could have done himself to save the property. It is true that in reply to a question on cross-examination as to whether there was anything that he could have done that he did not do, if the agent had told him at their first interview that the company would not pay the insurance, the respondent replied: "Not that I know of." It is apparent from the record that the respondent was talking about what he could do to collect his insurance and not whether he could have done anything to save the boat. There was evidence that the respondent went to the scene of the accident two or three times during the six-weeks' period and watched the efforts of the salvors. It is also apparent that he made no effort himself to save the boat. There is a reasonable inference from the evidence that he made no such effort because he believed the insurance company had taken charge of the boat and because he thought his interest was protected under the policy. There was independent evidence to the effect that the boat could have been saved if properly handled. It appears from the evidence that it took six weeks to get the boat to shore and that its condition constantly grew worse. The question before us is not one of the preponderance of the evidence but it is whether there is any evidence at all to sustain the finding of the trial court. In our opinion, the continued activity of the appellant, after knowledge of the transfer and assignment, for a period of six weeks before liability was denied, with the other acts shown, especially in view of the testimony that the agent at least twice held out the hope of a prompt settlement, was sufficient to cause the respondent reasonably

to believe that the provision of the policy had been waived, and the evidence is sufficient to indicate that the respondent changed his position in reliance upon the acts of the appellant, and is sufficient to support the finding complained of.

The trial court found that on March 6, 1928, the respondent abandoned the boat in question to the defendant. It is urged by the appellant that this finding is not supported by the evidence. We think this contention must be sustained. Section 2716 of the Civil Code defines an abandonment as follows: "Abandonment is the act by which, after a constructive total loss, a person insured by contract of marine insurance declares to the insurer that he relinquishes to him his interest in the thing insured."

Under the other provisions of this code, not only must a notice of such an abandonment be explicit, but the abandonment must neither be partial nor conditional, and the thing insured may not be abandoned unless more than half of the value thereof is actually lost. As one of the conditions precedent to an abandonment, the duty rests upon the insured to make enough investigation to reasonably satisfy himself that the amount of the loss is sufficient to justify an abandonment (*Klein* v. *Globe & Rutgers Fire Ins. Co.,* 2 Fed. (2d) 137; *Chicago S. S. Lines* v. *United States Lloyds,* 2 Fed. (2d) 767). In the case before us, the respondent's own evidence shows that an abandonment, in the sense contemplated by the statute, did not take place. The only evidence given by the respondent to indicate an abandonment and notice thereof, was the following: "Yes, and I abandoned the boat to them at that time, that is they took charge of it." Not only does this fail to show, with the definiteness required, notice of an abandonment with the reason therefor, but on cross-examination the respondent testified that on the day he claimed to have made the abandonment he could not tell whether the boat would be a total loss or not, that he made no investigation along that line and none as to the cost of repair or the amount of salvage. He himself summed up what he did, as follows: "I didn't do anything. I just gave it to Mr. Hutchinson." As further indication of the fact that the ship in question was not totally abandoned to the insurer, it fully appears that the respondent took away the ship's engine without permission, sold the same and appropriated the proceeds thereof to his

own use. In addition, it may be observed that during the trial counsel for respondent particularly emphasized that "We are only suing for insurance upon the hull". Under these circumstances, we think that a technical abandonment is not shown and that this finding of the court is not sustained by the evidence.

[4] Appellant contends that the trial court erred in the amount of the judgment given. The judgment was for $2,000, the full amount named in the policy. Since the proof did not establish an abandonment with its constructive total loss, it was incumbent upon the respondent to prove the amount of damage suffered. By the terms of the policy, insurance in the amount of $2,000 was placed upon "the Body, Tackle, Apparel, Ordnance, Munition, Artillery, Boat and other Furniture of and in the good Sloop Yacht called the 'California' ''. The policy also contained this provision:

"The said yacht, for so much as concerns the assured, by agreement between the assured and assurers in this Policy, is and shall be valued at as follows:

Hull, Tackle, Apparel and Furniture...... $.....
Machinery and Boilers.................. $3,500
Thirty-five Hundred .................... Dollars.''

The rule applying to such a valued policy of marine insurance is thus stated in *Peninsular & O. S. S. Co.* v. *Atlantic Mut. Ins. Co.*, 185 Fed. 172, 175: " 'It is a general rule peculiar to contracts of marine insurance that, where the value of the insured's interest in the property insured exceeds the amount of the insurance, the insured is deemed a co-insurer as to such uninsured part, and the underwriter is only liable for such proportion of the loss as the amount of the insurance bears to the value of the insured's interest.' (26 Cyc. 672 [f], and many cases stated in the notes. See, also, 19 Am. & Eng. Ency., 2d ed., 1061, 5a; Richards, Insurance, 3d ed., sec. 50; *Western Assur. Co.* v. *Southwestern Transp. Co.*, 68 Fed. 923 [16 C. C. A. 65].)''

In the policy before us, the entire ship, including the hull, tackle, machinery and boiler, was valued at $3,500. Not only did the respondent take away the engine, but his counsel stated during the trial that he was only seeking to recover the value of the hull. The record contains no evidence as to what was the value of the engine taken out nor what was the value of the hull alone. While the appellant is

liable for a *pro rata* proportion of the loss, there is no evidence upon which the amount of such liability may be based, with the engine removed and its value not shown, and the allowance of the full amount of $2,000 has no evidence to support it, in the absence of proof of an abandonment. For this reason the case should be sent back for a new trial upon the one issue of the amount of the loss sustained. (*Morris* v. *Standard Oil Co.,* 188 Cal. 468 [205 Pac. 1073].)

The judgment is reversed and the cause remanded for a new trial solely upon the issue of the amount of loss sustained by the respondent, with directions to the trial court to render judgment in favor of the respondent for the amount of loss sustained and covered by the policy, upon the determination of that issue.

Marks, J., and Jennings, J., concurred.