**RELIANCE INSURANCE COMPANY,**
**Appellant,**

v.

**THE Yacht ESCAPADE ex THE THOR II**
**etc., et al., Appellees.**

**RELIANCE INSURANCE COMPANY,**
**Appellant,**

v.

**Howard BOND, Appellee.**

**Nos. 18017, 18018.**

United States Court of Appeals
Fifth Circuit.

June 17, 1960.

Cromwell A. Anderson, Hervey Yancey, Miami, Fla. (Smathers, Thompson & Dyer, Miami, Fla., of counsel), for appellant.

W. F. Parker, David M. Turner, Miami, Fla., for appellees in Nos. 18017, 18018.

W. F. Parker, Robert M. Thomson, Miami, Fla., for appellees in No. 18018.

Before HUTCHESON, BROWN and WISDOM, Circuit Judges.

JOHN R. BROWN, Circuit Judge.

We here test whether the District Court was correct in determining that by conduct of the underwriter subsequent to a loss it either waived or was estopped from asserting an acknowledged breach of the warranty of private pleasure use of a yacht hull policy. The significance of the Sue and Labor Clause in solving that problem may be at the heart of the case.

While ostensibly in the form of two separate proceedings,[1] this is in reality

---

1. The admiralty cause (No. 18017) was brought in rem against the Yacht by the salvors, Dunn's boat yard, and intervenor Allied Marine Corporation, for the recov-

a single case which grows out of the substantial damage sustained by the Yacht Escapade as a result of stranding near Cat Cay in the Bahamas on February 8, 1958. The M/Y Escapade was insured under an apparently standard yacht hull policy at an agreed valuation of $30,000. It contained variations of the hoary language generally found, Saskatchewan Government Ins. Co. v. Spot Pack, 5 Cir., 1957, 242 F.2d 385, 386; Tropical Marine Products, Inc. v. Birmingham Fire Ins. Co. of Pa., 5 Cir., 1957, 247 F.2d 116, 118, so that along with rovers, pirates and assailing thieves, it expressly covered losses due to perils of the seas. Of course, a strand, followed by severe pounding of the vessel for several days while salvors awaited abatement of the fury of the weather, was a classic case of a sea peril. Consequently, liability could not have been denied for want of an insured peril. Denial of liability, when it belatedly came, was on the ground that since the vessel had been chartered for a week's voyage, there was a breach of the private use warranty[2] and this voided the policy.

After a trial in which the Judge saw and heard all of the witnesses in the flesh, the Court held that notwithstanding the breach of this warranty, the Insurer had either waived the defense or was estopped to assert forfeiture from the breach. Recovery for all losses and additionally for all expenses incurred[3] under the Sue and Labor Clause,[4] was therefore decreed.

We need but briefly discuss the facts and then we shall do so in terms of those either expressly or impliedly found by the trial court. The Yacht was actually stranded February 8, but Bond, the owner and Assured, did not receive word from the Yacht until February 11. He immediately reported the casualty to the office of Hansen, the Insurance Agent who had executed and delivered the policy for the Insurer and who soon took over local direction of the handling of the loss under continuous reporting to the home office. Hansen's office, during his personal absence, dispatched McClaskey, a marine surveyor who thereafter acted as the representative of the Insurer, to Cat Cay to examine the stranded vessel.

ery of $2700 for salvage and $1288.17 due the shipyard for cleaning up and preventive work done on the Yacht preliminary to survey after delivery by salvors. Bond, the yacht owner, impleaded Reliance Insurance Company, the Insurer, on the ground that the salvage, admittedly due, was payable ultimately by the Insurer under the policy. The Court granted recovery to the Owner for the amount paid by him to the salvors ($2967.90). The shipyard bill was taken care of in the civil action.

The civil action (18018) was brought by Bond, the owner, against Reliance, the Insurer, to recover his full loss for damage to the yacht. The District Court granted recovery for the loss in value (estimated cost of repairs in the sum of $19,890.05), the value of fitting stripped and pilferred ($3500) and the clean-up work preparatory to survey (approximately $1095.99) plus Florida statutory attorneys' fees.

2. Under the heading "General Conditions" the policy provided:

"Private pleasure warranty: Warranted by the Assured that the vessel shall be used solely for private pleasure purposes and shall not be hired or chartered unless approved by the Assurers, and permission endorsed hereon."

3. Payment to the salvors and to the shipyard for preventive clean-up preparatory to the survey, see note 1, supra.

4. Under the heading "Section 'A'—Hull Insurance," the policy provided (brackets are inserted to identify the later waiver clause [2]):

"Sue and labor: [1] In case of any loss or misfortune, it shall be lawful and necessary for the Assured, their factors, servants and assigns, to sue, labor and travel for, in and about the defense, safeguard and recovery of the said vessel, or any part thereof, without prejudice to this insurance; the charges whereof we, the Assurers, will contribute according to the rate and quantity of the sum herein insured. [2] And it is especially declared and agreed that no acts of the Assurer or Assured in recovering, saving or preserving the property insured, shall be considered as a waiver or acceptance of abandonment."

Before leaving for Cat Cay, McClaskey called Dunn, the salvors, to inquire whether they could undertake salvage if it proved feasible. McClaskey returned to Miami on February 12. On the morning of February 12, Hansen talked to Bond and learned from Bond that the vessel had been chartered. Meyers, an assistant of Hansen, immediately obtained a copy of the charter. That afternoon Hansen and Meyers called on Bond at his office where salvage of the M/Y Escapade was discussed. Although they did not tell Bond about it, Hansen had already talked to the home office of the Insurer, had informed them of the existence of the charter-party, a copy of which he then had, and on instructions from the home office had called in counsel then and still acting for the Insurer because of the known breach of the private pleasure warranty, note 2, supra.

Hansen and Meyers went to Bond's office that afternoon because Bond was contending that the Yacht was a total loss and was therefore being abandoned to the Insurer. Hansen was adamant that the Insurer would not accept an abandonment and was equally emphatic that it was Bond's responsibility to protect his property and to salvage the vessel if feasible. Although McClaskey, pursuant to Hansen's earlier directions, had made preliminary arrangements with the salvors, Hansen made it plain to Bond that if Bond did not personally authorize the salvage, Hansen and McClaskey, for the Insurer, would call the salvors back.

In other words the Insurer, though having a right to take action pursuant to the Sue and Labor Clause, see note 4 supra, declined to do so and put the full responsibility on the Assured. There was no dispute that probable salvage cost, estimated in the neighborhood of $2,000, was discussed.[5] At any rate Hansen made plain to Bond that he had to arrange for salvage, and the implication was equally positive that if Bond failed to do so, both the salvage program then underway would be stopped, and the Insurer would disclaim any further liability. Following such demands Bond prepared a letter of authority along these lines addressed to the salvors. McClaskey picked it up later on the afternoon of February 12, then flew to Cat Cay and delivered the letter to the salvors who had arrived with the salvage equipment but had not yet begun the salvage operations.

But direction by Hansen through McClaskey for the Insurer was not yet at an end. Whether present all the time or not, McClaskey kept in constant touch with the salvage operations. The vessel was returned by the salvors to Miami on February 19 where she was taken to the shipyard of Allied Marine Corporation. McClaskey outlined certain work to be done but the shipyard, apparently wary of instructions from surveyors, declined to perform any work. McClaskey, still acting for the Insurer, told Bond that Bond would have to authorize the shipyard to do the work. Bond asserts with no real contradiction [6] that his compliance with

5. Bond and his wife strenuously insisted that Hansen had stated that Bond need not worry as the Insurance Company would pay this sum over and above the $30,000 limit of the policy. This was denied by Hansen and Meyers and the District Court did not resolve this conflict. We do not regard it as decisive, but it seems quite evident that from the nature of Sue and Labor, both parties in discussing expenditures for Sue and Labor in the best of faith could have thought that such amounts are recoverable over and above the face value of the policy. Their difference would be over whether Hansen categorically agreed to pay or whether this was left to operation of the policy.

6. McClaskey was examined by Bond's counsel in the light of the invoice of March 10, 1958, from Allied Shipyard in the sum of $1,095.99. In addition to other items for washing down and cleaning up the interior of the vessel for $94 etc., the balance of it ($924.96) related primarily to labor charges for disassembly and desalting, removal of the main engine, generator, compressor and electrical equipment from the boat to prevent damage and clean up "for inspection by surveyor."

To the question "Now, are those [items of work specified on this exhibit] substantially the things that you wanted done?" his answer was a masterpiece of a Tinker-to Evers-to Chance process

McClaskey's demand was that he advised the shipyard that they were authorized to do whatever work Hansen or McClaskey instructed them to do. Whatever the terms of the authorization, Hansen or McClaskey were the ones to give directions, and since they were not then acting as friends of the vessel owner, their interest and activity was related solely to the interests of the Insurer.

Though all of this from February 12 up through the early days of March had gone on under the active, direct, personal participation of McClaskey, the Insurer's representative and with full detailed reports to the home office,[7] the Insurer was silent about the claim. To Bond's persistent inquiries, Hansen, handling the loss on the ground for the Insurer, merely told Bond to be patient. It was not until March 7 that Bond received from the Insurer the first and only communication (except for pleadings filed in court). On that date Hansen wrote Bond "I have a message from [Reliance] to the effect that they are not accepting liability in connection with your accident on [M/Y Escapade]." Oddly enough this even requested cooperation in the further investigation of the claim—an act wholly inconsistent with denial of liability.[8]

These circumstances led the District Court to find estoppel. In the brief memoranda opinion touching the highlights the Court emphasized the inconsistency in the action of the Insurer (through Hansen) asserting that Bond would have to look after and protect his own property as the Insurer would not accept abandonment. The Court pointed out "Neither of these statements can have any rational significance in the face of a denial of liability by insurer. They can become meaningful only in a context predicated upon continuing liability, for insurer is not concerned with abandonment if it denies all liability, and the only compulsion upon the insured to care for his damaged property is his desire to do all required by the 'sue and labor clause'; thus to keep the policy in force and so become entitled to a recovery." [173 F.Supp. 832]

By this appeal the Insurer attacks generally the holding of estoppel and urges specifically that it cannot be applied here for two special reasons. The first is that estoppel cannot be applied to extend coverage. The second is that even if the Insurer under principles applicable generally to insurance companies was estopped from asserting the breach of the private

---

by which to make this action that of the Assured, not the Insurer:

"A. That wasn't what I wanted done. They were what I informed the Allied Marine that would have to inform Mr. Hansen to get Mr. Bond to have this done, before I could get in the boat to inspect it."

7. Hansen's testimony made clear two things: (1) the home office was completely silent but (2) it was completely informed and never repudiated any of McClaskey's or Hansen's acts.

"Q. * * * you want this court to believe that the Home Office remained quiescent and did nothing? A. Very likely. Quite possible.

"Q. And they did that, knowing what you were doing down here with reference—A. Oh. they knew all about what we were doing. Don't worry about that.

"Q. They knew that, didn't they? A. Yes, sir.

"Q. You told them? A. You certainly can bet on that.

* * * * * * *
"Q. * * * But you told them the vessel was being brought in? A. That's right.

"Q. You told them the vessel was being taken up the river? A. Right.

"Q. And it was being put on the ways? A. Right.

"Q. It was being disassembled? A. Right.

"Q. And it was being surveyed? A. Right.

"Q. And estimates were being made? A. Right.

"Q. You told them all of that? A. Right, that's right.

"Q. And they did nothing? A. They did nothing.

"Q. —They did nothing until on or about the 6th or 7th of March when they wrote you and told you—* * *."

8. The letter continued: "Hank [Meyers] told you over the telephone the other day that they [Reliance] wanted to talk to the charterers and your early attention to this will be appreciated."

pleasure use warranty against the claim for sue and labor expenses since this was a marine policy having the unique sue and labor provision, there could be no estoppel as to the named peril claim for the damage to the Yacht itself.

The first of these objections may be quickly answered. We are aware that this Court, as have many others, see Home Ins. Co. v. Campbell Motor Co., 1933, 227 Ala. 499, 150 So. 486; 16 Appleman, Insurance Law and Practice, § 9090, at 628–629 (1944), has declared that estoppel or waiver cannot supply a contract where none existed, it cannot supply coverage where the contract did not. "It is well settled that conditions going to the coverage or scope of a policy of insurance, as distinguished from those furnishing a ground for forfeiture, may not be waived by implication from conduct or action. The rule is that while an insurer may be estopped by its conduct or its knowledge from insisting upon a forfeiture of a policy, the coverage or restrictions on the coverage cannot be extended by the doctrine of waiver or estoppel." C. E. Carnes & Co. v. Employers' Liability Assurance Corp., 5 Cir., 1939, 101 F.2d 739, at 742.

■ But the estoppel here found as a fact by the District Court does not create a new liability or grant a coverage not already in the policy. As we pointed out this hull policy by traditional language reflecting the even more ancient traditions of marine underwriters intends to, and does, cover expressly damage from perils of the seas. Stranding is a peril of the sea. So is pounding from the angry waves. Liability under the policy will be absent not because the peril is not covered, but because action of the Assured in chartering the Yacht has ostensibly "forfeited" the policy coverage otherwise existing. But these promissory warranties do not really forfeit the contract as that awesome term is normally under-

stood. Consistent with the law's abhorrence of the harsh consequence of forfeiture, violations of such policy provisions are looked upon as bringing about a temporary "forfeiture" which is more accurately described by the term now generally used—coverage of the policy is *suspended.* "Consequently coverage is not permanently destroyed. It is suspended so long as, but only so long as the violations of the specified basic policy requirements continue. Equally clear, coverage is revived the moment the breaches or conditions cease." Lineas Aereas Colombianas Expresas v. Travelers Fire Ins. Co., 5 Cir., 1958, 257 F.2d 150, 155, and see especially note 9.

■ Of course, at the moment the Yacht fetched up and the loss commenced, the breach had not yet been cured, and the suspension, unlike Henjes v. Aetna Ins. Co., 2 Cir., 1943, 132 F.2d 715, 1943 AMC 27, was still operative. But the point is that the private pleasure warranty merely provided a defense to an occurrence and loss otherwise covered under the policy.[9] As in the case of any other defense to contract coverage, it may be waived or the underwriter may be estopped to assert it, and doing so is not expanding or creating a new coverage.

We do not think that the second specific reason is any more availing. Moreover, a discussion of it will also serve to dispose of the general attack on the holding of estoppel under the broad grounds that the action of the Insurer could not properly be regarded as inconsistent nor as inducing conduct detrimental to the Assured. The nub of the second objection seems to be this. Granted that action of an insurance company comparable to that taken here by the Insurer from February 12 to March 7 was inconsistent with denial of liability and induced action detrimental to the Assured so that a court would hold that the Insurer was estopped from asserting the known and

9. This is especially true of a warranty as qualified as the private pleasure warranty, note 2, supra. By its own terms, it is operative unless the charter is approved by the insurer and permission enchanged. dorsed. What the underwriter has reserved unto itself to approve by special permission in advance, it can waive or assent to after the event.

available defense thereby reviving the *whole* of the forfeited contract,[10] a different result is required here. This, the argument goes, is so because the inconsistent action by the Insurer, on the one hand, and the detrimental injury to the Assured, on the other, all relate to the efforts to salvage and protect the vessel from further harm. These, by nature, are sue and labor expenditures covered separately under the unique provision of the Sue and Labor Clause of marine policies. This clause, therefore, takes the case out of the operation of the usual rule, and the estoppel may run only as to such sue and labor expenditures, not the loss from the named insured peril.

■■ The argument is initially beguiling. It seems to say that since sue and labor is treated as added supplemental coverage, the policy may be approached as though it were two contracts, not just one as in the ordinary insurance policy. Consequently, the inconsistent-detriment-inducing-conduct should be confined to that separable (if not separate) undertaking. The trouble with this is that it ignores the history, function and purpose of the Sue and Labor Clause. In a capsule, that may be briefly stated. Since an assured has the duty toward his underwriter to exercise the care of a prudent uninsured owner to protect insured property in order to minimize or prevent the loss from the occurrence for which the underwriter would be liable under the policy, the clause undertakes to reimburse the assured for these expenditures which are made primarily for the benefit of the underwriter either to reduce or eliminate a covered loss altogether. Also it affirmatively protects the position of each as to abandonment.[11]

10. The Insurer's brief puts it this way. "It may well be said that the insurance contract, as the result of the events that have transpired between Bond and Reliance, could not be held to be valid as to part and invalid as to part; in short, that its coverage provisions are not separable. Were this any type of insurance contract other than one of marine insurance, Reliance would be forced to concede that such is the case."

11. The clause is an ancient one. "It is not known when the words were first inserted in policies, but a clause of similar import appears in the 'Tiger' policy, dated 1613. The latter part of the clause, the 'waiver,' is of later origin and may have been introduced, in part at least, to make clear the privilege of the underwriter himself to step in and protect the insured property." Winter, Marine Insurance, page 195 (3rd ed. 1952). At the bottom is the assured's legal duty toward the underwriter to take action after an occurrence to prevent or minimize loss. "The existence of such a duty has been judicially recognized both in this country and in the United States [footnote 26 cites Columbian Ins. Co. v. Ashby, 1830, 4 Pet. 139, 29 U.S. 139, 143, 7 L.Ed. 809]; and Arnould, writing in 1848, stated that it had long been settled that it was the clear duty of the assured to labour for the recovery and restitution of detained or damaged property." 2 Arnould, Marine Insurance § 799a at 721–722 (1950). The clause

is inserted "primarily for this purpose * * * thus converting into an express obligation under the policy that which existed as a duty implied by law and requiring that the assured use due diligence in taking measures for saving and preserving the damaged property." Winter, supra, at 393. Compliance by the assured with this contractual duty is not optional either under the original language or the modification that "it shall be lawful and *necessary*," see [1] note 4, supra. "Courts have held that the insertion of the word 'necessary' does not essentially alter the operation of the clause. It imposes no additional duty on the master. He was already bound to labor diligently for the recovery of the property and to alleviate the burden of the insurer." American Merchant Marine Ins. Co. v. Liberty Sand & Gravel Co., 3 Cir., 1922, 282 F. 514, 522. Republic of China v. National Union Fire Ins. Co., D.C. Md., 1957, 151 F.Supp. 211, at page 238, 1957 AMC 915.

Against the background of this duty, the purpose of the clause is at least twofold. It "is to [a] encourage and [b] bind the assured to take steps to prevent a threatened loss for which the underwriter would be liable if it occurred, and when a loss does occur to take steps to diminish the amount of the loss." White Star S.S. Co. v. North British & Mercantile Ins. Co., D.C.E.D. Mich.1943, 48 F.Supp. 808, 813, 1943 AMC 399, quoted with approval in

Taking the analysis through the next step, it is obvious that since the clause is to reimburse the assured for expenses incurred in satisfying the assured's duty to the underwriter, there is no such duty where the policy, for one reason or another—either basic lack of coverage or an unwaived defense, forfeiture, etc.—does not apply. The underwriter has no right to demand that the assured take the sue and labor steps unless the policy is applicable. An assertion of any such demand is therefore consistent only with continued existence of the coverage. This is made all the clearer by the very nature of sue and labor as a supplementary coverage. While it is true that it is often spoken of in such terms, and certainly when applicable does obligate the underwriter over and above the specified dollar limits of the policy, this expression must be used with caution. The obligation comes into being only when the action taken is to minimize or prevent a loss for which the underwriter would be liable. If the underwriter would not be liable at all—here because of breach of the personal use warranty—there would be no contractual obligation to repay sue and labor. The sue and labor "coverage" is therefore tied irrevocably to the insured perils coverage. By the same token, where such demand reflecting continued coverage is made by the underwriter, action taken pursuant to it by the assured works to his detriment when liability is thereafter declined.

Consequently, the actions of the Insurer had a significance which far transcended potential sue and labor liability. In assaying this conduct, we do not, as the Insurer seems to think the District Judge either did or had to do, confine it to February 12. The salvage at sea activities went on from February 12 to at least February 19 when the Yacht was brought to the shipyard in Miami. Whatever uncertainty there might have been about the position the Insurer should ultimately take as decisions were being made under considerable pressure on February 12, none prevailed during the following six days. Continued acquiescence by the Insurer in the salvage

Home Ins. Co. v. Ciconett, 6 Cir., 1950, 179 F.2d 892, 895. Its principal ultimate aim is clear. "Prevention of loss is the very object in view. It contemplates the benefit of the insurers only * * *." 2 Arnould, supra, § 871 at 795. While it is frequently said that "the sue and labor clause is a separate insurance and is supplementary to the contract of the underwriter to pay a particular sum in respect to damage sustained * * *," White Star S.S. Co. v. North British & Merc. Ins. Co., supra, 48 F.Supp. 808, 812–813, 1943 AMC 399, the obligation under it is keyed to the existence of liability on the underwriter as to the loss from the named peril. "The * * * expenses must have been incurred with a view to averting or minimizing a loss for which the underwriter would have been liable under the policy." Templeman & Greenacre, Marine Insurance at 115 (4th ed. 1934). It is "separate," of course, in the sense that the reimbursement to the assured is in addition to, and over and beyond, the amount payable under or the dollar limits of, the named perils coverage. "Under this clause the assured recovers the whole of the sue and labor expense which he has incurred * * * and without regard to the amount of the loss or whether there has been a loss or whether there is salvage, and even though the underwriter may have paid a total loss under the main policy." White Star S.S. Co. v. North British & Merc. Ins. Co., supra, 48 F.Supp. 808, 813, 1943 AMC 399.

In addition to the specific references above, the following also bear generally on the clause. 1 Arnould, Marine Insurance §§ 22–23 (13th ed. 1950); 2 Arnould, supra, §§ 864–872, 799a; 6 Appleman, Insurance Law and Practice §§ 3794–3795 (1942); Templeman & Greenacre, Marine Insurance at 112–118 (4th ed. 1934); Winter, Marine Insurance at 195, 196, 393 (3rd ed. 1952); American Merchant Marine Ins. Co. v. Liberty Sand & Gravel Co., 3 Cir., 1922, 282 F. 514; White Star S.S. Co. v. North British & Merc. Ins. Co., D.C.E.D.Mich.1943, 48 F.Supp. 808, 1943 AMC 399; Ciconett v. Home Ins. Co., W.D.Ky.1948, 80 F.Supp. 429, affirmed, 6 Cir., 1950, 179 F. 2d 892; Republic of China v. National Union Fire Ins. Co., D.C.Md.1957, 151 F.Supp. 211, 1957 AMC 912.

operations ostensibly pursuant to the letter order exacted by it from the Assured accompanied as it was with continued silence about denial or acceptance of liability were equally significant circumstances. Moreover, the action taken at the shipyard requiring that the Assured authorize the expenditure of nearly $1,000 to remove, clean and preserve valuable machinery from further salt water deterioration, and, more important, to clean up the ship to permit survey were likewise acts wholly inconsistent with nonliability. The former was to prevent further damage, and the latter related to survey wholly unnecessary if the Insurer considered that the contract had been forfeited for breach of warranty. And, of course, all of this was done in comparative leisure from February 19 up through early March, and in the light of detailed information being furnished the home office, see note 7, supra, it was the action of the Insurer, not merely its agents.

The presence of the Sue and Labor Clause made the necessity for prompt announcement of the Insurer's position more, not less, emphatic. With full knowledge from February 12 on of the exact facts concerning the charter which was alone the basis for a tardy denial of liability three weeks later, the Insurer stood silent while at the same time asserting the imperative demands that the Assured take these costly actions or run the risk that he would have no insurance. The District Judge on what is essentially a question of fact was entitled to reach the conclusion, which withstands the clearly erroneous concept of F.R.Civ.P. 52(a), 28 U.S.C.A., that for such conduct this marine underwriter would fare no better than would an insurer on traditional land risks. As to them, the law is clear that whether regarded as waiver, or more properly as estoppel, inconsistent action to the detriment of the assured has the effect of reviving the contract obligation theretofore "forfeited" for breach of warranty or other policy provision.[12]

■ The District Court on ample evidence, F.R.Civ.P. 52(a), determined that these actions of the Insurer were inconsistent with nonliability from a known breach of warranty, and that the Assured had been induced by this conduct to take action to his detriment. This is the essence of estoppel, and on this conclusion the District Court was correct in allowing recovery thereon in both of the actions for sue and labor expenses and for loss due to the named peril.

Affirmed.

---

12. See 16 Appleman, Insurance Law and Practice, §§ 9081–9090, 9253–9254, 9368 (1944) especially § 9081 discussing the conceptual differences between waiver versus estoppel. "It must ordinarily be shown * * * that the insurer had knowledge of the facts constituting a breach or forfeiture, and that there was some unequivocal act of the insurer recognizing the continuance of the policy or which was wholly inconsistent with a forfeiture." 16 Appleman, supra § 9086 at 616. "Since forfeitures are not favored in the law, an insurance company may not set up a forfeiture where by its course of conduct it has induced a belief in the insured that a provision for forfeiture will not be insisted upon * * * [and] in such instances the courts will interpose an estoppel to safeguard the rights of the policy holder. The insurer will be estopped from denying liability where, by its course of dealing, or its open actions, it has induced the insured to pursue a course of conduct to his detriment." 16 Appleman, supra § 908 at 623–624. "A policy which has been forfeited may be revived by mutual consent of the contracting parties. And a void policy may also be reinstated as a result of a waiver by the Insurer." 6 Appleman, supra § 4150 at 669.

See also Tinsley v. Aetna, 1918, 199 Mo.App. 693, 205 S.W. 78; General Accident Fire & Life Assur. Corp. v. Schero, 5 Cir., 1945, 151 F.2d 825 (involving Florida law); Kahmann & McMurry v. Aetna Ins. Co., 5 Cir., 1917, 242 F. 20, 29; Hilton v. Federal Ins. Co., 1931, 118 Cal.App. 495, 5 P.2d 648; Bankers Life v. Ashford, Tex.Civ.App. 1940, 139 S.W.2d 858; 29A Am.Juris, Insurance, § 1099.

HUTCHESON, Circuit Judge (concurring in part and dissenting in part).

While I concur in the opinion and the result in No. 18017, the admiralty case, I dissent from both opinion and result in No. 18018.

The policy issued by Reliance was a yacht policy, containing a private pleasure warranty as follows:

"Warranted by the Assured that the vessel shall be used solely for private pleasure purposes and shall not be hired or chartered unless approved by the Assurers, and permission endorsed hereon."

The evidence was undisputed, indeed it was admitted, that this express warranty was deliberately breached by the insured by chartering the yacht for charter hire of $125.00 per day. The charterer, a young lady, and two friends, with a captain employed for the charter, took the vessel to the Bahama Islands, where the vessel was run aground near Cat Cay. The result of the decision of the court is, in my opinion, to make the theory of estoppel operate to extend the coverage to a risk not only not provided for in, but prohibited by, the policy of insurance. In my view, there is no basis whatever in the record for the result reached in this case.

I was a member of the court which decided Lineas, etc. v. Travelers, 5 Cir., 257 F.2d 150, cited by the court here as authority for its conclusion, and I must vigorously dissent from the idea that that case deals with a similar situation to that existing here or furnishes any authority for the result reached here. What and all that is involved in this case is that an express warranty was flagrantly breached, and for the loss to the insured, against which it did not contract, the insurer is being made to pay. Convinced as I am that the opinion, by supporting the theory of estoppel in this case, runs a good principal into the ground, I Dissent.