**WESTCHESTER FIRE INSURANCE COMPANY, Appellant,**

v.

**Jeff Miller RHOADES et al., Appellees.**

**No. 11425.**

Court of Civil Appeals of Texas.

Austin.

July 20, 1966.

Rehearing Denied Aug. 24, 1966.

Dean Moorhead, Austin, for appellant.

Cofer, Cofer & Hearne, Douglass D. Hearne, Austin, for appellees.

HUGHES, Justice.

Jeff Miller Rhoades, doing business as Rhoades Truck Lines and Maryland Casualty Company, a Maryland Corporation, appellees, sued Westchester Fire Insurance, an incorporated stock company under the laws of New York, authorized to write casualty, fire and inland marine insurance

in Texas. For cause of action appellees alleged that on July 6, 1961, appellant issued its policy of insurance to Rhoades insuring all risks of direct physical loss or damage from external cause to an oil well gas pump belonging to Desota Gas Producing Company[1] while being transported[2] from Houston to Sidney, Texas. The maximum liability under this policy was $45,000.00. That on May 24, 1962, Desota sued Rhoades alleging damages to the gas pump while in transit from Houston to Sidney in the sum of $43,400.00. Rhoades impleaded appellant in this suit, who refused to defend Rhoades but, instead, entered into an agreement with Desota whereby appellant would be dismissed from the suit and Desota would prosecute its suit against Rhoades, and if Desota recovered a judgment against Rhoades, appellant would be reimbursed its costs, but if no recovery was had appellant would pay Desota a certain sum of money.[3]

Appellees further pleaded that as a result of appellant's refusal to defend Rhoades in the Desota suit and by reason of the above agreement Rhoades was forced to employ counsel for such purpose and to call upon his "secondary insurer" Maryland Casualty Company to assist in such defense under a policy of insurance Rhoades had with Maryland. The Desota suit resulted in a take nothing judgment for Desota.

The policy of insurance, attached to appellees' Petition, contains no provision giving appellant the right or making it its duty to defend the insured, Rhoades, in any suit brought against Rhoades for damages to the property insured and transported by him but appellees alleged that appellant was a signatory to three co-insurance agreements, naming them, recognized and followed by the insurance industry under which appellant was the primary insurer whose duty it was to defend the insured in any suit brought against him concerning damage to the insured property, and that the breach of this duty and by reason of the agreement made between appellant and Desota, appellees had been damaged in the sum of $8,943.90, which included attorney's fees, Court costs and other expenses incident to and incurred in the defense of Rhoades in the Desota suit.

Appellees also alleged that the above acts on the part of appellant were willful and malicious and that they were entitled to recover an additional $9,000.00 as exemplary damages.

1. This is a partnership composed of A. R. Cassard and D. L. Clark.

2. This word is loosely used. The policy is specific in fixing the time and place of coverage.

3. This agreement was admitted in evidence and provides:
"1. Within three (3) days from the execution and delivery of this instrument, Cassard and Clark will dismiss Westchester from said Cause No. 126,648 in the 126th District Court of Travis County, Texas, such dismissal to be with prejudice and to bar any further action or claim by Cassard and Clark or their assigns under said Policy No. IF 387,228 for damages to said Worthington gas compressor engine.
2. If Cassard and Clark obtain a final judgment in said Cause No. 126,648 in the 126th District Court of Travis County, Texas, or in any other cause that they may file against Jeff Miller Rhoades or in any other suit based on the same cause of action and actually collect less than Four Thousand Dollars ($4,000.00) (exclusive of court costs and attorney's fees), Westchester will pay to Cassard and Clark the difference between said amount and Four Thousand Dollars ($4,000.00). Otherwise Westchester shall have no liability hereunder.
Cassard and Clark further agree to diligently prosecute their cause of action for damages to the hereinabove, described Worthington gas compressor engine against Jeff Miller Rhoades d/b/a Rhoades Truck Line to final adjudication, including an appeal if there be a sound basis for such appeal. Upon voluntary payment, or upon final adjudication and the exhaustion of collection remedies by diligent efforts, Westchester will be obligated to make payment hereunder and will at such time become subrogated to any judgment or interest which Cassard and Clark may have against Jeff Miller Rhoades to the extent of such payment."

Appellant answered these allegations by general denial only.

Trial was non-jury. Judgment for $8,506.76, actual damages, and $4,000.00 exemplary damages was rendered for appellees.

There are no findings of fact or conclusions of law.

We are of the opinion that appellant was under no duty to defend Rhoades in the suit brought against him by Desota.

The policy of insurance issued by appellant provided:

"THIS POLICY INSURES: Against all risks of direct physical loss or damage from any external cause (except as hereinafter provided)."

In effect, during a portion of the time Rhoades transported the gas pump, was an insurance policy issued to him by Maryland which provided:

"This policy insures the legal liability of the insured as a common or contract carrier under tariff documents, bills of lading or shipping receipts issued by the insured, for direct loss or damage to lawful goods or merchandise in transit. * * *"

Paragraph 6 of that policy is headed "Defense of Suits" and provides:

"The Company agrees to defend in the name and behalf of the insured any suit against the insured for loss or damage for which insurance is afforded under this policy; but the Company shall have the right to make such investigation, negotiation and settlement of any claim or suit as may be deemed expedient by the Company. The Company agrees to assume the expenses incurred by it under this clause, except settlements of claims and suits, in addition to the applicable limits of liability of this policy. The insured shall cooperate with the company in obtaining evidence, effecting settlements, and conducting suits, hearings and trials."

Prior to the trial of the Desota suit, Maryland was notified of the suit and it, through its attorneys, took over the defense for Rhoades and procured a judgment in his favor.

We need not discuss or determine whether Maryland had a duty, under the circumstances, to defend Rhoades in the Desota suit. Clearly, the policy it issued to Rhoades made this its duty if the loss asserted was within policy coverage. Just as clearly, no such duty, the duty to defend Rhoades under any circumstances, was cast by appellant by the terms of the policy it issued to Rhoades. This duty to defend is contractual and if there is no contract to defend there is no duty to defend.

In United States Fidelity and Guaranty Co. v. Baldwin Motor Co., 34 S.W.2d 815, Tex.Comm. of App., the Court held the insurance company not liable for the expense of defending a suit against the insured where even though the duty to defend was imposed by the policy the suit involved a hazard not covered by the policy, the Court saying: "The insurance company's obligation to defend or pay a judgment is based upon the contractual liability assumed by its policy." Similar language is found in Automobile Underwriters' Insurance Co. v. Long, 63 S.W.2d 356, Tex.Comm. of App.

It is generally held that the obligation of an insurer to defend and its obligation to pay a loss are several, the obligation to defend being personal to the insurer and the insured the insurer is bound to perform and cannot require the insured to accept defense by others. American Fidelity & Casualty Co. v. Pennsylvania Threshermen and Farmers' Mutual Casualty Insurance Co., 280 F.2d 453 (5th Cir.). See also United States Fidelity and Guaranty Co. v. Tri-State Insurance Co., 285 F.2d 579, (10th Cir.); West American Insurance Co. v. Allstate Insurance Co., 295 F.2d 513 (10th Cir.). See also an annotation in 69 A.L.R.2d, p. 690 discussing the duty of a liability insurer to appeal cases where by the policy it is required to

defend. The annotator commences Section 2 by stating, "Basically, of course, the existence of a duty to appeal, if any, is dependent upon the contract of insurance."

No case has been cited by either party, or found by us, which holds or in which an effort was made to have the Court hold, an insurer under a duty to defend the insured in any case brought against him where the policy did not expressly impose such obligation. This case must, therefore, be decided upon general principles relating to the law of insurance. These principles are fundamental and may be briefly stated.

■ An insurance policy is a contract entered into between the insurer and the insured, by which each party becomes bound to perform the obligations assumed in the policy of insurance. The parties to an insurance policy may make such contract as they see fit, provided no provision of law or public policy is contravened. Insurance policies being contracts, they are governed by the rules of interpretation that are applicable to contracts generally, notwithstanding the rule that contracts of insurance are to be strictly construed in favor of the insured. The courts can only construe a contract as it was made; they are not authorized to make a new contract for the parties. The terms of the policy constitute the measure of the insurer's liability.

The above stated principles are taken literally from 32 Tex.Jur.2d, pp. 23, 29, 102–3, 105–7.

■ It follows, in our opinion, that appellant, under its policy, had no duty to defend Rhoades.

■ We also hold that no duty to defend Rhoades arose by reason of an "Agreement of Guiding Principles Fire-Inland Marine Insurance" to which Maryland and appellant were subscribers. The following testimony is conclusive on this point.

Mr. Gerald E. Bryan, District Supervisor for Maryland-American-General Group testified for appellees, in part, as follows:

"Q Now, Mr. Bryan, in summary, is it your opinion, based upon your actual experience in the field of underwriting casualty losses and settling claims arising therefrom and your knowledge of the rules of guiding principles between inland marine insurance carriers that Westchester Fire Insurance Company under its policy, which is Plaintiff's Exhibit No. 1 in this case, was the primary insurer with respect to the Cassard and Clark claim and with respect to the coverage afforded by Maryland Casualty Company's policy?

A Yes, sir, the Westchester Fire Insurance Company was the primary insurer.

Q Now, when a determination is made, Mr. Bryan, as between two different insurance companies as to one being the primary insurer and the other being the secondary insurer, what is the general rule or pattern followed by those two insurance companies thereafter?

A You mean, how would the companies handle the claim?

Q Yes, sir.

A The primary would pay up to the limits of liability under its policy and if there was any other loss, the excess carrier would take it up from there under its policy.

Q So, in your opinion, the Westchester Fire Insurance Company, if they followed the guiding principles that you have discussed and if they followed the standards set by the insurance industry, should have attempted to negotiate or settle this claim against Mr. Rhoades up to the policy limits of $45,000 before calling upon Maryland. Is that correct?

A Yes, sir.

Q Based upon your experience and knowledge of these guiding principles, Mr. Bryan, is it the custom and practice of the signatory members to *this* guiding principles *to* follow those principles which are set out there?

A Yes, sir."

In comparing the policy of appellant with that of Maryland, Mr Bryan testified:

"The Westchester's policy insures against all risks of physical loss, subject to other provisions, whereas the Maryland's policy insures against the legal liability of the insured, subject to other provisions. Note that the Westchester policy insures for damage to an object, whereas the Maryland policy insures the insured for his legal liability to others for property damage. In other words, the Westchester policy is a physical damage (direct coverage) policy where the first party is insured, whereas the Maryland's policy is based on legal liability of the insured to pay property damage to third parties.

While the Westchester policy would pay simply because the insured object was damaged, the Maryland policy would not pay unless the insured was legally liable."

On cross examination the attention of Mr. Bryon was directed to the fact that the Maryland policy contained a duty to defend clause whereas appellant's policy did not, and regarding this he testified:

"Q I understood that Plaintiff's Exhibit 13 represented an attempt by you to compare those policies and the obligations and liabilities each insurer undertook by the respective policies?

A Well, I did not compare every point in the respective policies. I did not compare the exclusions. In other words, I did not compare them right down to the letter, but what I figured was the highlights of the policy where you get your coverage.

Q Wouldn't you consider an obligation to defend an insured an affirmative duty or obligation of the insurer rather than an exclusion?

A Yes, sir, it would be.

Q As a matter of fact, in the Maryland Casualty policy, Maryland Casualty in effect agreed to do two things, did it not, within the limits of the policy and subject to the terms thereof, it provided liability coverage for Mr. Rhoades and his truck line and secondly, it undertook an obligation to defend any suits that might be brought against Mr. Rhoades that seemingly were within the confines of the policy?

A Yes, sir.

Q And in Plaintiffs Exhibit No. 12, which is the Maryland policy in this case, in a typewritten endorsement attached to the policy, there is a separate paragraph 6 headed 'Defense of Suits' in which Maryland undertook this additional obligation, is there not?

A Well, like I say, I did not highlight this.

* * * * * *

Q And as you consider the policy, the Maryland policy did expressly undertake that obligation to defend as a part of the policy?

A Yes, sir.

Q I hand you Plaintiff's Exhibit No. 1, which is the Westchester policy, Mr. Bryan, and ask you if you find any similar provisions in that?

A No, sir, I do not find any such agreement to defend and in my opinion, the particular policy here would normally not have it.

Q It would normally not have it?

A Because it is a first party policy and normally, your claims are made by the insured against the insurance company, whereas in the Maryland policy, you have legal liability involved and are defending the insured against a third party.

Q You pointed out in that Plaintiff's Exhibit 13, Mr. Bryan, a clear distinction that exists between a policy that is a legal liability policy like the Maryland Casualty one, and one which merely insures against physical damage to a specified object such as the Westchester policy?

A Yes, sir.

Q Isn't this a fair summary of the two policies, Mr. Bryan, considered with respect to this gas compressor engine: the Westchester policy insured within the terms of the policy that gas compressor engine against physical damage; is that correct?

A All risk or physical loss.

Q And the Maryland Casualty policy would also apply, if I understand, if that engine had been damaged and would obligate Maryland Casualty to do two things: One, defend any suit that might be brought against Mr. Rhoades alleging that he was responsible for the damage, and two, stand behind him and back up his liability if he were found liable in that type of lawsuit?

A Yes, sir.

*    *    *    *    *    *

Q You would not say that it was the duty of Westchester Fire Insurance Company to defend or to attempt to settle and negotiate the suit brought against Mr. Rhoades, would you?

A I would not think so, no."

■ Notwithstanding this testimony of Mr. Bryan, appellees contend that under the following provisions of appellant's policy it was obligated to negotiate or settle Desota's claim against Rhoades:

"5. Settlement of Claims. All adjusted claims shall be paid or made good to the Insured within thirty (30) days after presentation and acceptance of satisfactory proof of interest and loss at the office of this company.

*    *    *    *    *    *

23. Impairment of Carriers Liability. Any act or agreement by the Insured, prior or subsequent hereto, whereby any right of the Insured to recover the full value of, or amount of damage to, any property lost or injured and insured hereunder, against any carrier, bailee or other party liable therefor, is released, impaired or lost, shall render this policy null and void, but the Insurer's right to retain or recover the premium shall not be affected. This Company is not liable for any loss or damage which, without its consent has been settled or comprised (sic) by the Insured."

Mainly, it seems to us, Sec. 23 pertains to actions which the insured may have against third parties for damage or loss to the insured property. The facts here do not activate these provisions. The last sentence of Section 23 if it refers to claims against the insured, as here, does not obligate the insurer to settle a claim against the insured it merely prohibits the insured from making a binding settlement on the insurer without its consent.

■ Appellees attempt to invoke the "Stowers"[4] doctrine in this case, that is that appellant was obligated to negotiate

4. Stowers Furniture Company v. American Indemnity Co., 15 S.W.2d 544, (Tex.Comm. of App.).

in good faith a settlement of the Desota suit against Rhoades. The Stowers doctrine is inapplicable here because the claim asserted by Desota against Rhoades did not exceed the limits of liability of appellant as fixed by the policy issued Rhoades. Under the pleadings in that case no judgment could have been rendered against Rhoades in excess of his insurance coverage with appellant. In Stowers the insured was sued and judgment was obtained for more than the amount of the insurance.

We are unable to agree with appellees that appellant was under any duty to attempt in good faith to settle the Desota suit. It had the right to run any risk involved in letting Rhoades fend for himself.

Appellees cite American Fidelity and Casualty Co. v. All American Bus Lines, 190 F.2d 234 (10th Cir.) to support its contention that appellant was required to exercise good faith in negotiating a settlement of the Desota suit. In that case both insurance companies had the duty by contract to defend the insured. The liability of the primary insurer was limited to $10,-000.00 per person. The secondary insurer assumed liability of $10,000.00 to $100,000.-00 per person. This is a typical Stowers situation and the primary insurer was bound to exercise due care and good faith in attempting to settle the claim within the limits of its own liability.

Maryland's policy was in excess of the amount of liability specified in appellant's policy but, as stated, the claim asserted by Desota was not in excess of this sum.

Maryland honored its obligation to defend Rhoades and it made a successful defense. We cannot understand how Maryland can hold appellant for the cost of discharging this obligation. It voluntarily assumed this duty. Appellant did not.

How the liability for any judgment which Desota may have obtained against Rhoades should have been apportioned between appellant and Maryland is not before us since no judgment was obtained.[5]

We hold, in accordance with the authorities above noted, that the obligation to defend is separate and distinct from the obligation to indemnify; the obligation to defend being personal cannot inure to the benefit of another insurer, especially where no duty to defend has been assumed by the company sought to be charged.

Appellees also contend that appellant is liable for the cost of defending Rhoades under the "Sue and Labor" clause contained in its policy which reads:

"Sue and Labor. In case of loss or damage, it shall be lawful and necessary for the Insured, his or their factors, servants and assigns, to sue, labor, and travel for, in and about the defense, safeguard and recovery of the property insured hereunder, or any part thereof without prejudice to this insurance; nor shall the acts of the Insured or this Company, in recovering, saving and preserving the property insured in case of loss or damage, be considered a waiver or an acceptance of abandonment to the charge whereof this Company will contribute according to the rate and quantity of the sum herein insured."

Under footnote 11 in Reliance Ins. Co. v. The Escapade, (5th Cir., 1960) 280 F.2d 482, 488, 86 A.L.R.2d 1236, Judge Brown points out that the duty of the insured under the "Sue and Labor" clause is two-fold.

"It 'is to (a) encourage and (b) bind the assured to take steps to prevent a threatened loss for which the underwriter would be liable if it occurred, and when a loss does occur to take steps to diminish the amount of the loss.' White Star S. S. Co. v. North British & Mercantile Ins. Co., D.C.E.D.Mich.1943, 48 F.Supp. 808, 813, 1943 AMC 399, quoted with approval

5. The "Guiding Principles" referred to supra, relate only to contribution to the

"loss" where two or more companies are liable for the same loss.

in Home Ins. Co. v. Ciconett, 6 Cir., 1950, 179 F.2d 892, 895. Its principal aim is clear. 'Prevention of loss is the very object in view. * * *'"

We believe the "Sue and Labor" clause relates only to safeguarding the "property insured." It cannot, in our opinion, be converted into a promise to pay the costs of defending a suit brought against the insured by a third party to recover for damages to the property. The protection or preservation of the property insured is not involved in such litigation.

It is our opinion that appellees have failed to plead or prove a cause of action. It is accordingly ordered that the judgment of the trial court be reversed and judgment is here rendered that appellees take nothing by their suit.

Reversed and rendered.