Robert McADAM, Plaintiff,

v.

STATE NATIONAL INSURANCE COMPANY, INC. and Does 1 through 25, inclusive, Defendants.

Case No. 12–cv–1333–BTM–MDD.

United States District Court, S.D. California.

Signed June 19, 2014.

Anna F. Roppo, Annette Colleen Clark, William Patrick Keith, Duckor Spradling Metzger and Wynne, San Diego, CA, for Plaintiff.

Joan M. Borzcik, Gordon & Rees LLP, San Diego, CA, Matthew C. Elstein, Musick Peeler & Garrett LLP, San Diego, CA, for Defendants.

## ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BARRY TED MOSKOWITZ, Chief Judge.

Defendant State National Insurance Company, Inc. ("State National") seeks summary judgment as to all claims. The Court held a summary judgment hearing on May 20, 2014. For the reasons set forth herein, as well as those stated at the hearing, the Court **DENIES** the motion.

## I. *BACKGROUND*

This case arises from a "Hull and Machinery/Protection and Indemnity" insurance policy issued by State National to Plaintiff Robert McAdam ("Plaintiff" or "McAdam") for the term May 5, 2011 to May 5, 2012 (No. TUV221275–00). The policy was issued on May 9, 2011, and was subsequently amended via endorsements. (Def.'s Ex. 12.) As of September 22, 2011 the policy insured, *inter alia,* two vessels: *Jessica M* and *Shirley B.* (Def.'s Ex. 12 at SNIC 0032 (Endorsement no. 5.)) It did not cover operations south of the Califor-

nia/Mexico border until endorsement no. 14 became effective on December 21, 2011. (Def.'s Ex. 12 at SNIC 0040.)

Robert McAdam does not own the vessels, as alleged in the Complaint. (Compl. ¶ 9.) Rather, he is the managing member of McAdam's Fish LLC. (McAdam Decl. ¶ 5.) For purposes of limiting liability, McAdam's Fish owns its vessels through eight wholly owned subsidiaries, each of which owns a fishing vessel. (Opp'n 1.) The *Jessica M* is owned by subsidiary Charca Fish III LLC and the *Shirley B* is owned by subsidiary Charca Fish IV LLC. (McAdam Decl. ¶ 7.)

McAdam's Fish bought the vessels in 2011, when they were shrimp trawlers. They were then stripped and converted into tuna boats at an Alabama shipyard. (McAdam Decl. ¶ 10–13; Def.'s Ex. 13 at 88:15–22.) In September or October 2011, Plaintiff contacted insurance broker Sharon Edmondson seeking coverage for the *Shirley B* and *Jessica M* (originally named the *Alyona M* and the *Svetlana M*). (Decl. of Sharon Edmondson ("Edmondson Decl.") ¶ 12.) Endorsement no. 5 to the policy, effective September 22, 2011, provided $460,000 and $474,000 in hull and machinery coverage, respectively, with a $10,000 deductible. (Def.'s Ex. 12 a SNIC 0032.) Master Marine, Inc. completed conversions on the boats in mid December 2011. (McAdam Decl. ¶ 13.) On December 21, 2011, the hull coverage for each vessel was increased to $800,000 by endorsement nos. 8 and 9, which also provide $500,000 in protection and indemnity coverage, and coverage for a crew of five salaried at $425 per month for five months. (Def.'s Ex. 12 at SNIC 0035–36.) After they underwent stability tests, McAdam sent the vessels to the South Pacific to fish. (McAdam Decl. ¶ 14.)

On February 24, 2012, the *Shirley B's* rudder snapped off while the vessel was fishing near New Zealand. The *Jessica M* traveled some seventy miles to provide assistance, and towed the *Shirley B* to port in Tauranga, New Zealand. State National or its agent directed the *Shirley B* to a repair yard, and both ships were repaired in New Zealand. While towing the *Shirley B*, the crew of the *Jessica M* allegedly reported that her steering became "loose" and "sloppy." (Def.'s Ex. 68, SNIC 0153–54.) Plaintiff sought reimbursement for repairs under the policy. State National retained Optimum Claims Services, Inc. ("Optimum") for claims adjustment purposes and hired marine surveyor Arnold & Arnold ("A & A") to inspect the vessels. (State National is a "program" underwriting firm that does not do claims adjustment itself.) Of the approximately $163,000 claimed for repairs to the *Shirley B*, State National paid $126,875.07. The claim concerning the *Jessica M* was denied in May 2012.

On June 4, 2012, Plaintiff filed this lawsuit, asserting the following causes of action: (1) breach of insurance contract; (2) breach of the implied covenant of good faith and fair dealing; (3) injunctive relief and restitution pursuant to Cal. Bus. & Prof.Code §§ 17200, *et seq.;* and (4) declaratory relief. The Court dismissed the third cause of action. (Doc. 9.) State National now seeks judgment as to each remaining claim.

## II. *LEGAL STANDARD*

Summary judgment is appropriate under Rule 56 of the Federal Rules of Civil Procedure if the moving party demonstrates the absence of a genuine issue of material fact and entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material when, under the governing substantive law, it could affect the outcome of the case.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Arpin v. Santa Clara Valley Transp. Agency*, 261 F.3d 912, 919 (9th Cir.2001). A dispute is genuine if a reasonable jury could return a verdict for the nonmoving party. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505.

A party seeking summary judgment always bears the initial burden of establishing the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323, 106 S.Ct. 2548. The moving party can satisfy this burden in two ways: (1) by presenting evidence that negates an essential element of the nonmoving party's case; or (2) by demonstrating that the nonmoving party failed to establish an essential element of the nonmoving party's case on which the nonmoving party bears the burden of proving at trial. *Id.* at 322–23, 106 S.Ct. 2548. "Disputes over irrelevant or unnecessary facts will not preclude a grant of summary judgment." *T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n*, 809 F.2d 626, 630 (9th Cir.1987).

Once the moving party establishes the absence of genuine issues of material fact, the burden shifts to the nonmoving party to set forth facts showing that a genuine issue of disputed fact remains. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; *In re Oracle Corp. Sec. Litig.*, 627 F.3d 376, 387 (9th Cir.2010). The nonmoving party cannot oppose a properly supported summary judgment motion by "rest[ing] on mere allegations or denials of his pleadings." *Anderson*, 477 U.S. at 256, 106 S.Ct. 2505. When ruling on a summary judgment motion, the court must view all inferences drawn from the underlying facts in the light most favorable to the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986).

## III. APPLICABLE LAW

 A marine insurance contract is interpreted in accordance with the law of the state in which it was formed unless there is a controlling federal rule on point, or unless there is a reason to create a federal rule. *Wilburn Boat Co. v. Fireman's Fund Insur. Co.*, 348 U.S. 310, 75 S.Ct. 368, 99 L.Ed. 337 (1955); *Ingersoll–Rand Fin. Corp. v. Employers Ins. of Wausau*, 771 F.2d 910 (5th Cir.1985). *See also Ghotra v. Bandila Shipping, Inc.*, 113 F.3d 1050, 1054 (9th Cir.1997). Following this rule, except where there is an "entrenched federal precedent," state substantive insurance law governs marine insurance disputes. *See, e.g., Certain Underwriters at Lloyds, London v. Inlet Fisheries, Inc.*, 518 F.3d 645 (9th Cir. 2008). Here, absent an established federal rule or need to create one, California law applies. *See* generally Cal. Ins.Code Part 1 (Fire and Marine Ins.); *Abbey Co., LLC v. Lexington Ins. Co.*, 289 Fed.Appx. 161, 163–164 (9th Cir.2008) ("Insurance policies are contracts, and "[t]he words of a contract are to be understood in their ordinary and popular sense."" (quoting Cal. Civ.Code § 1644.)); *Bennett v. State Farm Mutual Auto. Ins. Co.*, 731 F.3d 584 (6th Cir.2013).

## IV. DISCUSSION

 A breach of contract claim under California law requires the plaintiff to establish four elements: (1) the existence of a contract; (2) plaintiff's performance or excuse for nonperformance of the contract; (3) defendant's breach of the contract; and (4) damages resulting from defendant's breach of the contract. *Troyk v. Farmers Group, Inc.*, 171 Cal.App.4th 1305, 1352, 90 Cal.Rptr.3d 589 (2009). State National raises several challenges to Plaintiff's breach of contract claim, as well as his tortious bad faith claim.

## A. *Plaintiff's Standing as the Insured*

An insurance policy is valid only if the insured has an insurable interest at the time the policy issues.[1] *See* Cal. Ins. Code § 280; *Paul Revere Life Ins. Co. v. Fima*, 105 F.3d 490, 491 (9th Cir.1997). "Insurable interest is a keystone of the concept of insurance, safeguarding the insurer against the risk that arises if one who will receive the monetary benefit from loss of the insured property (or life, as it may be) has no interest in the property not being destroyed." *Woods v. Independent Fire Ins. Co.*, 749 F.2d 1493, 1496 (11th Cir.1985). "California law does not require that insureds themselves own traditional forms of property interests to create an insurable interest in property." *Abbey Co., LLC v. Lexington Ins. Co.*, 289 Fed. Appx. 161, 163 (9th Cir.2008). Rather, "[e]very interest in property, or any relation thereto, or liability in respect thereof, of such a nature that a contemplated peril might directly damnify the insured, is an insurable interest." Cal. Ins.Code § 281. *See also Hooper v. Robinson*, 98 U.S. 528, 538, 25 L.Ed. 219 (1878) ("The agent, factor, bailee, trustee, consignee, mortgagee, and every other lien-holder, may insure to the extent of his own interest in that to which such interest relates."); *Shade Foods, Inc. v. Innovative Prods. Sales & Marketing, Inc.*, 78 Cal.App.4th 847, 875, 93 Cal.Rptr.2d 364 (2000); *Jam Inc. v. Nautilus Ins. Co.*, 128 S.W.3d 879 (Mo.Ct.

App.2004). Whether an insurable interest existed is a question of fact. *See Am. Gen. Life Ins. Co. v. Germaine Tomlinson Ins. Trust*, 2010 WL 3893673, *5, 2010 U.S. Dist. LEXIS 103730, *14–15 (S.D.Ind. 2010).

State National argues that McAdam lacks standing to sue as the insured person because he is not the owner of the vessels. In response, McAdam argues that his interest in them has been, at all relevant times, insurable. McAdam is the largest individual investor in McAdam's Fish LLC, with a 22% share (initial capital investment of $1.67M). (McAdam Decl. ¶ 6.) Operating the company is his full-time job and his salary is his primary source of income. (*Id.* ¶¶ 6, 8.) He also has outstanding loans to the company. (*Id.* ¶ 8, 26.) On the insurance application, McAdam is written-in as "manager" and the relevant subsidiary is named as the owner. (*See* Def.'s Exs. 9 & 10; Edmondson Decl. ¶¶ 12–14.) *See generally* Cal. Ins.Code § 388 ("When an insurance contract is executed with an agent or trustee as the insured, the fact that his principal or beneficiary is the real party in interest may be indicated by describing the insured as agent or trustee, or by other general words in the policy."). An email exchange between the insurance broker and State National's exclusive underwriter, indicates that State National was on notice of the ownership structure, at least as of December 19, 2011.

---

1. The value of the interest at the time of loss may limit recovery, as insurance contracts provide indemnity, not profit. *Davis v. Phoenix Ins. Co.*, 111 Cal. 409, 43 P. 1115 (1896). *See also* Cal. Ins.Code § 389. The measure is "the extent to which the insured might be damnified by loss or injury thereof." Cal. Ins.Code § 284. When the name of the person intended to be insured is specified in a policy, it can be applied only to his own interest. *Id.* § 287. Where the description of the insured is so general that it may comprehend any class of persons, the claimant must show it was intended to include him. *Id.* § 390. Where the language is uncertain as to the persons protected, it is interpreted "in its most inclusive sense, for the benefit of the insured." *Safeco Ins. Co. of America v. Hartford Fire Ins. Co.*, 238 Cal.App.2d 77, 79, 47 Cal.Rptr. 550 (1965). "In a case of partial loss, a marine insurer is liable only for such proportion of the amount insured by him as the loss bears to the value of the whole interest of the insured in the subject matter." Cal. Ins.Code § 1988. *See also Hilton v. Federal Ins. Co.*, 118 Cal.App. 495, 5 P.2d 648 (1931).

(Edmondson Decl. ¶ 16; Pl.'s Ex. F.) Additionally, the policy accommodates situations where the "assured" is not the only owner via an "affiliated companies clause." (*See* Def's Ex. 12 at 4 of 14 (SNIC 015).) Moreover, the policy provision for claims brought by someone other than the owner would be a nullity if such claims were precluded. (Def.'s Ex. 123:4–5 ("If a claim is made under the Policy by anyone other than the Owner of the vessel, such person shall not be entitled to recover to a greater extent than would the Owner, had claim been made by the Owner as an Assured named in this Policy.").)

In light of this evidence, the Court finds that State National has failed to meet its burden as to the issue of whether Plaintiff had an insurable interest in the vessels.[2] *See Tri–State Mut. Grain Dealers Fire Ins. Co. v. Morris*, 268 F.2d 956 (9th Cir. 1959) (under California law, the insured had an insurable interest in a restaurant that burned down even though the sale had not yet closed); *Gillis v. Sun Ins. Office, Ltd.*, 238 Cal.App.2d 408, 413, 47 Cal.Rptr. 868 (1st Dist.1965) (affirming finding that a defunct corporation named as the insured held an insurable interest where "[the insurer] intended to insure the property in question; there was no fraud or misrepresentation on the part of the insured; there was no increase of hazard on the part of the insurance company on account of the error in the name of the insured or because of the merger; the management remained the same; and the

insurer accepted and retained the premium payments"); *Seamen v. Enterprise Fire & Marine Ins. Co.*, 18 F. 250 (C.C.E.D.Mo.1883) (finding a shareholder owning three-sixteenths of company that owned a steamboat to have an insurable interest in the vessel).[3]

## B. *Exclusions*

### 1. *The Shirley B*

■ An exclusion for betterment or improvements is standard in insurance policies. *Fireman's Fund Ins. Co. v. Sneed's Shipbuilding, Inc.*, 803 F.Supp.2d 530, 535 (E.D.La.2011). State National contends that it has paid the full amount owed on the claim for repairs to the *Shirley B* because any excess amount constituted charges for "betterment" not covered by the policy. (*See* Hillger Decl. ¶¶ 15–16; Def.'s Ex. 76.) Plaintiff disputes this with the opinion of the surveyor he hired, Steve Mabbett. According to Mr. Mabbett, the repairs were necessary to make the ship fit for its intended purpose. (Def.'s Ex. 81.) On this record, the extent to which repairs to the *Shirley B* constituted betterment not covered by the policy is a genuinely disputed issue of material fact.

### 2. *The Jessica M*

■ Relying upon the so-called "Inchmaree clause," State National argues that the policy does not cover the repairs to the *Jessica M*.[4] "An Inchmaree clause

---

2. In light of this conclusion, the Court need not address Plaintiff's argument that State National has conceded, forfeited, or waived its right to challenge Plaintiff's standing. (Opp'n (Doc. 80) at 13.) Nor does the Court need to rely on admissions applicable to the motion *sub judice* by Rule 36(a) and the May 20, 2014 Order (Doc. 105).

3. The result on this point is the same whether the Court applies California law or admiralty law. *See ABB Power T & D Co. v. Gothaer*

*Versicherungsbank VVAG*, 939 F.Supp. 1568, 1580 (S.D.Fla.1996) ("[U]nder federal admiralty law, 'insurable interest' is easily understood to mean 'any pecuniary interest.' ").

4. This type of clause became a staple of marine insurance contracts after the House of Lords, in an 1887 decision applying the *ejusdem generis* rule of construction, held that the bursting of a boiler on the steamship *Inchmaree* was not a covered peril. Federal law applies to its interpretation to the extent the

significantly expands the hull insurer's undertaking by specifying coverage for a variety of perils in addition to the 'adventures and perils' of the sea specified in the ancient language of the standard form policy." *Thanh Long Partnership v. Highlands Ins. Co.*, 32 F.3d 189, 191 (5th Cir. La.1994). The clause *sub judice* provides, in pertinent part:

> ADDITIONAL PERILS (INCHMAREE) Subject to the conditions of this Plic this insurance also covers los of or damage to the Vessel directly caused by the following: ...

> Breakdown of motor generators or other electrical machinery and electrical connections thereto, bursting of boilers, breakage of shafts, or any latent defect in the machine or hull, (excluding he cost and expense of replacing or repairing the defective part); ...

> Negligence of Charterers and/or Repairers, provided such Charterers and/or Repairers are not an Assured hereunder;

> Negligence of Masters, Officers, Crew or Pilots; Provided such loss or damage has not resulted from want of due diligence by the Assured, the Owners or Managers of the Vessel, or any of them....

(Def.'s Ex. 12, p. SNIC 000005.)

State National argues that, under this clause, the policy does not cover repairs to remedy ordinary wear and tear, latent defects, or damage that has not yet occurred. (Mot. at 19.) That may be so with respect to the "cost and expense of replacing or repairing the defective part" itself. Yet that argument fails because State National has not shown that the repairs to the *Jessica M* are not covered by the "Negligence of Charterers and/or Repairers" subsection. (*See* Def.'s Ex. 81 (Plaintiff's surveyor opining that the failure to replace the rudder's top bearing during the *Jessica M's* conversion constituted negligence on the part of the Alabama shipyard).) "Repairers" is undefined, but could be read to include workers performing the inadequate welds [5] that prompted the later repairs to the *Jessica M. See generally Exxon Corp. v. St. Paul Fire & Marine Ins. Co.*, 129 F.3d 781 (5th Cir.1997) (ambiguities in a marine insurance contract drafted by the insurer are interpreted in favor of coverage). Since this subsection contains no exclusion for the defective part itself, as, e.g., the breakage and latent defects sections do, the contract could be interpreted to include the repairs to the rudder assembly.

State National suggests that the inadequate welds to the rudder assembly must be interpreted as latent defects under the Inchmaree clause. The clause does exclude repairs to (or replacement of) the defective part itself. *See, e.g., Ferrante v. Detroit Fire & Marine Ins. Co.*, 125 F.Supp. 621, 624–26 (S.D.Cal.1954) (concluding that, with respect to a latent defect, the Inchmaree clause precludes coverage for the defective part itself, as opposed to damage caused by the failure of

---

clause is consistent with those involved in federal maritime precedent. *See generally 5801 Assocs., Ltd. v. Continental Ins. Co.*, 983 F.2d 662, 666 (5th Cir.1993) ("entrenched federal precedent exists on the interpretation of the Inchmaree clause").

**5.** The record indicates that the *Jessica M's* steering problems were caused, in part by inadequate welds to the sole piece. (*See, e.g.,*

Def.'s Ex. 21; Hillger Decr. ¶ 14.) Each party's surveyor opined that failure to replace the rudder stock bearings was also a contributing factor. (*See* Hillger Decl. ¶ 12; Mabbett Decl. ¶ 7); Def's Ex. 81 at 3 (Plaintiff's surveyor opining that he bearing was in such a condition that it would have been evident that it needed to be replaced.); Def.'s Ex. 68 at SN00155 (Doc. 57–9) at 131 (A & A report.)

the part); *Mellon v. Federal Ins. Co.*, 14 F.2d 997, 1003 (S.D.N.Y.1926) ("To hold that the clause covers it would be to make the underwriters not insurers, but guarantors, and to turn the clause into a warranty that the hull and machinery are free from latent defects, and, consequently, to make all such defects repairable at the expense of underwriters."). But State National cites no provision establishing that the welds were latent defects rather than negligent repairs, or that those categories are mutually exclusive. Thus, even assuming that ordinary wear and tear contributed to the steering problems, and that the inadequate welds did not cause any damage to other "parts" or "machinery," the Court cannot find that the Inchmaree clause precludes coverage for the *Jessica M's* repairs.

### C. *Breach of Warranties*

 "A warranty is an assurance by one party to an agreement of the existence of a fact upon which the other party may rely; it is intended precisely to relieve the promisee of any duty to ascertain the facts for himself." *United States ex rel. R Excavating v. PK Contrs.*, 1997 WL 753533, 2–3, 1997 U.S.App. LEXIS 34870, 6–7 (9th Cir.1997). The Court strictly construes maritime express warranties. *Lexington Ins. Co. v. Cooke's Seafood*, 835 F.2d 1364, 1366 (11th Cir.1988). The effect of a breach of warranty in a marine insurance policy is governed by state law. *Wilburn Boat Co.*, 348 U.S. at 317, 75 S.Ct. 368; *Suydam v. Reed Stenhouse of Washington, Inc.*, 820 F.2d 1506, 1508 (9th Cir. 1987) (referring to state law to resolve the consequences of a breach of an express warranty in a marine insurance policy); *N.H. Ins. Co. v. Home Sav. & Loan Co. of Youngstown, Ohio*, 581 F.3d 420, 426 (6th Cir.2009). Depending on the materiality of the warranty and the nature of the breach, a failure to strictly comply with the terms of an express warranty may discharge the insurer from liability. *See* Cal. Ins.Code §§ 446–449. *See also Palmquist v. Standard Acc. Ins. Co.*, 3 F.Supp. 356 (S.D.Cal.1933); *Yu v. Albany Ins. Co.*, 281 F.3d 803, 809 (9th Cir.2002); *Commercial Union Ins. Co. v. Pesante*, 359 F.Supp.2d 81, 82–83 (D.R.I.2005), *rev'd on other grounds by* 459 F.3d 34 (1st Cir. 2006) (finding no entrenched admiralty rule that a "failure to literally comply with an express warranty in a marine insurance contract voids the contract even if the breach is not material to the loss"). State National argues that its duty to provide coverage was suspended because Plaintiff violated (1) the stability warranty, (2) the warranty of seaworthiness, and (3) the survey warranty.

#### 1. *The Stability Warranty*

 The policy states:

30. STABILITY WARRANTY (H & P) (HP–109)

It is warranted by the Assured that any additions, installations, and/or structural changes to any vessel(s) insured, which would affect the stability of the vessel(s) will be reported to the Company before the vessel(s) proceeds to sea. It is further warranted by the Assured that the insured Vessel(s) will not proceed to sea until the stability of the insured vessel(s) has been examined and approved by a qualified marine surveyor. Any violations of this warranty shall void coverage under this policy from the time of such violation, notwithstanding anything contained to the contrary herein.

(Def.'s Ex. 12 at SNIC0020.)

State National argues that McAdam breached the stability warranty by sending the newly converted vessels to the South Pacific even though they were only allowed to travel to California following stability

tests in December 2011. (Mot. at 23.) McAdam contends that he complied with the warranty by having stability tests conducted by Sterling Marine LLC after the conversion. (Decl. of Travis Carter ¶¶ 1–2.) State National relies upon two December 22, 2014 letters from Travis Carter, principal of Sterling Marine LLC, each stating that "The stability booklets are still be [*sic* ] prepared based on the resultant calculations. The vessels [*sic*] stability is satisfactory for the owner to transit from the shipyard in Alabama to its home port in California." (Def.'s Exs. 20 (*Shirley B* ), 21 (*Jessica M* ).) Mr. Carter explains that the letter was intended to confirm that the vessels could safely leave the shipyard pending the final analysis of data from the stability tests, not to restrict the range of their travel. (Travis Decl. ¶ 9.) The Court therefore finds that whether either stability warranty was breached is a triable issue.

### 2. *The Warranty of Seaworthiness*

 The policy provides:

### 29. SEAWORTHINESS WARRANTY (HP–106)

Assured warrants that at the inception of this policy the vessel(s) insured hereunder shall be in a seaworthy condition and, thereafter, during the currency of this policy, the Assured warrants that he will exercise due diligence to keep the vessel(s) seaworthy, and in all respects fit, tight and properly manned, equipped and supplied. The Assured further warrants that the Assured and/or the Assured's Master will not knowingly permit the vessel(s) insured hereunder to proceed to seas in an unseaworthy condition. Any violation of this warranty of seaworthiness shall void coverage under this policy from the time of such viola-

tion, notwithstanding anything contained to the contrary herein.

(Def.'s Ex. 12 at SNIC 00020.)

These terms require the vessel to be seaworthy at the time of the inception of the hull policy and, with due diligence, to be kept in a seaworthy condition. "Seaworthy" generally means that the vessel is "reasonably fit for its intended purpose." *See, e.g., Gutierrez v. Waterman S.S. Corp.,* 373 U.S. 206, 213, 83 S.Ct. 1185, 10 L.Ed.2d 297 (1963); *Reliance Nat'l Ins. Co. v. Hanover,* 246 F.Supp.2d 126, 136 (D.Mass.2003). State National again argues that McAdam knew the *Jessica M* wasn't seaworthy when the ship sailed toward New Zealand in late December 2011 because she was only cleared to go to California. (Def.'s Ex. 21.) As explained *supra,* whether McAdam complied with contractual stability requirements is a triable issue.

State National also points out that, in the opinion of Plaintiff's surveyor, Steve Mabbett, the poor welds on the rudder assemblies and inadequate bracing rendered the *Jessica M* unfit for its intended purpose. (Def.'s Ex. 81.) Even assuming that the inadequate welds were a *latent* defect that rendered the ship unseaworthy, the warranty would be violated only where the assured *knowingly* allows a ship to sail in an unseaworthy condition. *Allstate Insur. v. Heil,* No. 07–097, 2007 WL 4270355, *7 (D.Haw.2007). For instance, it would have been a breach for Plaintiff to allow the *Jessica M* to return to sea without repair *after* learning it was no longer seaworthy due to the defects. The Court accordingly finds that State National has failed to demonstrate a breach of the warranty of seaworthiness. *See generally Hanover Fire Ins. Co. v. Holcombe,* 223 F.2d 844, 846 (5th Cir.1955) ("the burden of proving that a vessel is unseaworthy lies upon the insurance company"); *Aguirre v.*

*Citizens Cas. Co.*, 441 F.2d 141, 143 (5th Cir.1971) ("Determining the seaworthiness of a vessel at a particular moment in time is the responsibility of the trier of fact.") (citation and quotation marks omitted).

### 3. *The Implied Warranty of Seaworthiness*

■■■■ In addition to the express warranty, State National claims a violation of the "implied warranty of seaworthiness," arguing that the vessel was not seaworthy at the inception of the policy. (*See* Mot. at 22 n. 9.) (State National ostensibly assumes the inception of the policy to be December 21, 2011 the effective date of endorsement nos. 8 & 9 adopting the new hull values for the vessels, and not September 22, 2011, when endorsement no. 5 added the vessels to the policy.) According to the Fifth Circuit, in the United States, an implied warranty of seaworthiness applies to time hull policies such that, absent any contrary terms, the insurer's duty to perform may be discharged if the vessel was not seaworthy at the inception of the policy, regardless of whether the insured was aware of that fact. *See Employers Ins. v. Occidental Petroleum Corp.*, 978 F.2d 1422, 1439 (5th Cir.1992).[6] Under *Occidental Petroleum*, the absolute warranty applies "at least where the ship is in a port of repair at the time the policy attaches" and the unseaworthy condition was the sole cause of the loss. *Id.* at 1436, 1437. It applies to the extent it is not inconsistent with the express terms of the policy. Indeed, the Court in that case held that a clause covering, in essence, "the negligence of any person other than the insured, the owner, or the manager of the vessel .... waives or displaces the absolute warranty of seaworthiness implied at

the inception of a time policy." *Id.* at 1440.

■■■■ The question is whether any clauses of the policy "effectively supplant or waive the absolute implied warranty of seaworthiness at the inception of a time hull policy." *Id.* at 1438. In answering that question, the Court looks to "the language of the provision to see if it unambiguously covers risks which would ordinarily be excluded by a breach of the implied warranty of seaworthiness. If the clause does cover such a risk, then it may be said that the clause underwrites that particular type of seaworthiness." *Id.* at 1439 (citation omitted).

As discussed above, whether the conditions purportedly rendering the vessels unseaworthy were covered by the Inchmaree clause is a triable issue. Although the parties agree that inadequate welds contributed to the loss, the vessels sailed for two months before the loss. Weighing the evidence presented under the proper standard, the Court cannot say conclusively that the ships were unseaworthy as of December 21, 2011. The question of seaworthiness at the relevant time(s) hence remains a triable issue on this record. Moreover, even if the vessels were not seaworthy on that date, the express warranty of seaworthiness and the Inchmaree clause effect at least a partial waiver of the implied warranty of seaworthiness. *See Id.* at 1439. As discussed above, the "negligent repairers" provision may be construed as underwriting the negligence alleged here.

### 4. *The Current Survey Requirement*

■■■ On December 29, 2011, insurance broker Sharon Edmondson sent an email seeking an increase in the hull coverage

---

**6.** The parties have not established whether that decision is an entrenched rule of maritime law, but the Court assumes it is for present purposes.

for each vessel. (Def.'s Ex. 22.) Endorsement nos. 8 (*Jessica M*) and 9 (*Shirley B*) amended the coverage for the vessels effective December 21, 2011. The endorsements were emailed to Ms. Edmondson in January 2012. (Def.'s Ex. 27.) Each contains the following paragraph:

> A current condition & valuation survey is required. The survey must have been completed within the last 24 months and provided by 1/21/2012. Insured's written compliance with all recommendations is a condition of coverage provided by 1/21/2011.

(Def.'s Ex. 12 at SNIC 0035.)

State National argues that McAdam failed to satisfy this condition because no post-upgrade surveys were conducted or provided. McAdam argues, *inter alia,* that he complied with the condition. According to McAdam, Ms. Edmondson informed him that there was no need for a new survey since the last survey was less than two years old. (Edmondson Decl. ¶ 11, Ex. D.) She advised him to provide proof of the upgrades instead. (*Id.;* Def.'s Ex. 4 at 239–40 (McAdam Dep.)) Indeed, surveys on each vessel were conducted on August 24, 2011, and McAdam provided compliance certifications dated December 13, 2011. (Def.'s Ex. 24.) Whether McAdam was bound by this condition, and whether it was satisfied are therefore triable issues.

### D. *Omissions & Misrepresentations*

#### 1. *Uberrimaie Fidei*

 Marine hull insurance policies are contracts *uberrimae fidei*—i.e., they are grounded in the utmost good faith. *McLanahan v. Universal Ins. Co.,* 26 U.S. 170, 1 Pet. 170, 7 L.Ed. 98 (1828). Under the doctrine, an underwriter is presumed to act on the belief that the insurance applicant disclosed all facts material to the risk. *Certain Underwriters at Lloyds v.*

*Inlet Fisheries, Inc.,* 518 F.3d 645 (9th Cir.2008). If the insured misrepresents or conceals known material facts, the insurer may rescind the policy *ab initio,* even if the misrepresentation was unintentional. *Id.; C.N.R. Atkin v. Smith,* 137 F.3d 1169 (9th Cir.1998); *N.H. Ins. Co. v. C'Est Moi, Inc.,* 519 F.3d 937, 938 (9th Cir.2008). Material facts are those that tend to bear upon an insurer's decision to accept the risk, the premium, or the terms under which the risk is insured. *Gulfstream Cargo Ltd. v. Reliance Ins. Co.,* 409 F.2d 974 (5th Cir.1969). *See also* Cal. Insur. Code §§ 331, 359; *Miller v. Republic Nat'l Life Ins. Co.,* 789 F.2d 1336, 1340 (9th Cir.1986); *Mitchell v. United Nat'l Ins. Co.,* 127 Cal.App.4th 457, 469, 25 Cal. Rptr.3d 627 (2005) ("[California courts] have applied Insurance Code sections 331 and 359 to permit rescission of an insurance policy based on an insured's negligent or inadvertent failure to disclose a material fact in the application for insurance."); *Mao Xiong v. Lincoln Nat'l Life Ins. Co.,* 2009 WL 1549289, 4, 2009 U.S. Dist. LEXIS 45280, 13–14 (E.D.Cal. May 28, 2009).

 According to State National, when seeking endorsement nos. 8 and 9, McAdam failed to state that (a) the vessels were only allowed to travel to California, (b) they were owned by the Charca subsidiaries, and (c) the propellers were not optimal and would need to be replaced. (Mot. at 23.) As discussed above, the Court finds that the first two issues are triable. With respect to the propellers, State National relies on an email where John Eckart of HS Marine Props, who evaluated the propellers at the time of conversion, opined that "this will be much less than an optimal prop, but should be something workable to run until they get better props." (Def.'s Ex. 17.) McAdam contends that the email exchange with Eckart referred to efficiency, not safety or sea-

worthiness, and was therefore immaterial. As State National has not demonstrated that any nondisclosure here was material, the Court cannot grant summary judgment under the *uberrimaie fidei* doctrine.

### 2. The Misrepresentation Clause

The policy states:

> 31. MISREPRESENTATION (H & P) (HP–110) If the Assured has concealed or misrepresented any material fact or circumstance concerning this insurance or the subject matter thereof, or in case of any fraud, attempted fraud, or false swearing by the Assured, touching any matter related to this insurance or to the subject thereof, whether before or after a loss, coverage under this policy will be forfeited which otherwise was granted.

(Exhibit 12, p. SNIC 0020.)

 State National next argues that this clause was violated by a failure to disclose "the stability letters informing McAdam that the Vessels could only go to California and the email related to the design of the propellers. [Exhibits 17, 20, and 21]." (Mot. at 24.) State National relies upon the broad opinions of claims adjusters for the proposition that this information was material to the claims investigation. (Didier Decl. ¶ 26; Soares Decl. ¶ 7.) "The materiality of a misrepresentation is generally a question of fact unless the misrepresentation was so obviously unimportant that the trier of fact could not reasonably conclude that a reasonable person would have been influenced by it." *Chapman v. Skype, Inc.*, 220 Cal.App.4th 217, 229, 162 Cal.Rptr.3d 864 (2013). As noted by the Court above, the stability and propeller statements can be viewed as not affecting seaworthiness. They would not then be material.

State National also points to an email of the insurance broker referring to the owner as "Robert McAdam d/b/a Charca Fish." (Reply at 7.) While that statement was false, the record indicates that the error was rectified, since the endorsements concerning the vessels at issue do not contain the "d/b/a" language. (*See* Def.'s Exs. 9, 10; Edmondson Decl. ¶¶ 12–14.) Furthermore, as with the purported nondisclosure discussed above, the materiality of the misrepresentation is an issue for the jury.

### E. Plaintiff's Bad Faith Claim

 When an insurer unreasonably and in bad faith withholds payment of a claim in violation of the policy it is subject to tort liability for its breach of the covenant of good faith and fair dealing. *Gruenberg v. Aetna Ins. Co.*, 9 Cal.3d 566, 575, 108 Cal.Rptr. 480, 510 P.2d 1032 (1973); *Neal v. Farmers Ins. Exchange*, 21 Cal.3d 910, 921, 148 Cal.Rptr. 389, 582 P.2d 980 (1978). McAdam contends, *inter alia*, that State National's post-claim conduct, delay, and application of exclusions have been in bad faith and constitute breaches of the covenant of good faith and fair dealing.[7] For example, citing stan-

---

7. At the May 20, 2014 hearing, State National argued for the first time, that *Moradi–Shalal v. Fireman's Fund*, 46 Cal.3d 287, 250 Cal. Rptr. 116, 758 P.2d 58 (1988) forecloses Plaintiff's bad faith claim. In *Moradi–Shalal*, the California Supreme Court held that Cal. Ins.Code § 790.03 provides no private right of action for damages resulting from unfair insurer practices. It also held, however, that common law causes of action, including breach, of the covenant of good faith and fair dealing, remain available to those injured by insurer misconduct. *See Zhang v. Superior Court*, 57 Cal.4th 364, 382–83, 159 Cal. Rptr.3d 672, 304 P.3d 163 (2013) ("[Unfair Competition Law] claims may be based on claims handling practices, as long as they do not rest exclusively on [Unfair Insurance Practices Act] violations."). *Id.* Thus, State

dards set forth in California's Fair Claims Settlement regulations (10 C.C.R. § 2695.7), McAdam claims that State National failed to provide a timely coverage position. (*Id.* ¶ 96(h).) He also claims that State National's surveyor improperly ignored requests for reconsideration of the issues of betterment (*Shirley B*) and the denial of the claim for the *Jessica M*. State National argues that it is entitled to judgment on the bad faith claim because it acted in good faith in reliance on the opinions of experts.

 Under the "genuine dispute doctrine," reasonable conduct or a good faith mistake is no basis for a claim that the defendant violated the covenant of good faith and fair dealing. *Chateau Chamberay Homeowners Assn. v. Associated Internat. Ins. Co.*, 90 Cal.App.4th 335, 348, 108 Cal.Rptr.2d 776 (Cal.App.2001). But "an expert's testimony will not automatically insulate an insurer from a bad faith claim based on a biased investigation." *Id.* at 348–49, 108 Cal.Rptr.2d 776. There are "several circumstances where a biased investigation claim should go to jury: (1) the insurer was guilty of misrepresenting the nature of the investigatory proceedings; (2) the insurer's employees lied during the depositions or to the insured; (3) the insurer dishonestly selected its experts; (4) the insurer's experts were unreasonable; and (5) the insurer failed to conduct a thorough investigation." *Id.* (citations omitted). Here, Plaintiff clearly alleges, at a minimum, nos. 4 and 5, pointing to Defendant's cursory dismissal of the opinion of Plaintiff's surveyor, Steve Mabbett. Therefore, bad faith remains a triable issue. *See Wilson v. 21st Century Insur. Co.*, 42 Cal.4th 713, 723–24, 68 Cal. Rptr.3d 746, 171 P.3d 1082 (2007) ("[A]n insurer is not entitled to a judgment as a matter of law where, viewing the facts in the light most favorable to the plaintiff, a jury could conclude that the insurer acted unreasonably.").

## V. CONCLUSION

For the foregoing reasons, the Court concludes that State National has not shown any of Plaintiff's claims to be suitable for summary judgment. The Court accordingly **DENIES** State National's Motion for Summary Judgment. Plaintiff's objections (Doc. 80–11) are overruled as moot.

The trial shall begin on **September 2, 2014 at 9:30 a.m.** in Courtroom 15B.

**IT IS SO ORDERED.**

National's reliance on *Moradi–Shalal* is misplaced.